2001 OK 66

**STATE of Oklahoma, ex rel. OKLAHOMA BAR ASS'N, Complainant,**

v.

**William Earl ERICKSON, Respondent.**

**No. SCBD 4535.**

Supreme Court of Oklahoma.

July 3, 2001.

As Corrected July 13, 2001.

Loraine D. Farabow, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

Allen M. Smallwood, Tulsa, OK, for Respondent.

BOUDREAU, J.

¶ 1 The Oklahoma Bar Association brought Rule 6 disciplinary proceedings against Respondent attorney, William E. Erickson, alleging one count of professional misconduct for implying he had the ability to improperly influence a Creek County assistant district attorney in 1998. While the bar association asserted Respondent's conduct violated Rules 8.3(a) and 8.4(a), (c), (d) and (e) of the Rules of Professional Conduct, 5 O.S.1991 Ch. 1, App. 3–A (RPC), and Rule 1.3 of the Rules Governing Disciplinary Proceedings, 5 O.S. 1991 Ch. 1, App. 1–A (RGDP), the bar focused its prosecution of Respondent primarily on Rule 8.4(e): [1]

> "It is professional misconduct for a lawyer to: ... (e) state or imply an ability to influence improperly a government agency or official[.]"

Respondent stipulated to violations of Rules 8.4(a), (d) and (e) of the Rules of Professional Conduct and Rule 1.3 of the Rules Governing Disciplinary Proceedings. The Professional Responsibility Tribunal split its recommendation, with two members of the panel recommending no discipline and a

---

1. Rules of Professional Conduct, 5 O.S.1991 Ch.1, App. 3–A: Rule 8.3(a), knowledge another attorney has violated the Rules of Professional Conduct; 8.4(a), knowingly violate or attempt to violate the Rules of Professional Conduct; 8.4(c), engage in conduct involving dishonesty, fraud, deceit or misrepresentation; 8.4(e), to state or imply the ability to influence improperly a government agency or official; and Rules Governing Disciplinary Proceedings, 5 O.S.1991 Ch. 1, App. 1–A: Rule 1.3, acts contrary to proscribed standards of conduct.

third recommending a public censure. The bar association requested an unspecified period of suspension. Respondent, an attorney since 1989, has no previous disciplinary contacts with the bar association. William Erickson's, OBA #13102, official roster address is 4 S. Park St., Sapulpa, OK 74066.

## I. FACTUAL BACKGROUND

¶ 2 In 1998, a Tulsa attorney, Paul Brunton employed Respondent to help represent Harvey Capstick. Capstick was charged with three counts of pointing a firearm in Creek County. Although Capstick had no previous felony convictions of record, he was frequently involved in both civil and criminal litigation in Creek County. Capstick thought very little of the justice system in Creek County and distrusted virtually all officials in Creek County, including judges and the district attorney's office.

¶ 3 In the Summer of 1998, Respondent appeared in the Creek County courthouse on business unrelated to Capstick, when he ran into Don Nelson, the assigned assistant district attorney. Respondent brought up the case, at which point Nelson and Respondent had an exchange in which Nelson jokingly said that Capstick's cases could "go away" or be "made to go away" for fifty thousand dollars ($50,000.00). Respondent then jokingly replied "How about twenty-five thousand" ($25,000.00)? The two men then laughed and went their separate ways in the hall. The entire exchange was very brief.

¶ 4 Shortly after the encounter in the courthouse hallway, Respondent mentioned the exchange to lead counsel, Paul Brunton. Brunton indicated to Respondent that if the offer was a serious one that it needed to be reported to the FBI, Respondent agreed but told Brunton he did not think the offer was serious. However, both attorneys agreed they would mention it to the client, if for no other reason than to convey to the client all contacts with the district attorney concerning his case.

¶ 5 Brunton and Respondent subsequently met with Capstick and his father to discuss his case, possible plea options, and witness preparation for trial. At this meeting they informed Capstick about the hallway exchange with Nelson. They told Capstick the district attorney's offer was not serious, and explained to their client that had it been a genuine bribery offer they would need to report it to the FBI. Both Respondent and Brunton believed Capstick and his father left the meeting with the understanding that the $50,000.00 "offer" was an exchange made in jest that did not need to be reported to the FBI. Based on this meeting, Respondent believed the matter closed.

¶ 6 Respondent and Brunton apparently did not convince Capstick that Nelson's "offer" was made in jest, because shortly thereafter Capstick went to the FBI to report the bribery offer. In response to Capstick's contact, the FBI wired Capstick and sent him to Respondent's office (on September 11, 1998 and again on September 13, 1998) in an effort to determine if Respondent was willing to pursue a bribe on Capstick's behalf.

¶ 7 The disciplinary record includes both written transcripts of the wire conversations between Capstick and Respondent, as well as the tapes themselves. From the bar association's and Tribunal's perspective, the most damning evidence against Respondent is the September 11th wire conversation, where the following verbal exchange occurred between Capstick (Harvey) and Respondent (Bill): [2]

Harvey: That's what I'm trying to get to you know, because it is coming up pretty quick. Now, I was, now ya mentioned it before, and just going to ask you again . . . You know, this was when, ya know, Don Nelson was planning on being the prosecutor on it. You know, there was a $50,000 and you said $25,000 or whatever. If there was something like that, could I just come in here and drop it down so you take care of it?

Bill: Paul and I never discussed it again.

---

2. This quoted section of the discussion between Respondent and Capstick is only a small portion of the exchange that occurred with Capstick on September 11th. The entire conversation is not repeated here, since the remainder did not relate to the allegations of misconduct against Respondent.

Harvey: I am just talking to you, between me and you.

Bill: I don't know Harvey. The OSBI ... the OSBI and the ATF, I understand, are in town investigating the sheriff right now on his car lot.

Harvey: You mean Fugate?

Bill: Yeah. This is a bad time to be doing something like that with those kind of people laying around. Don Nelson might ... if we did something like that. Forget it with Max because it's not Don's case. I don't know if Don has the power to do that now. Okay?

Harvey: But I mean, if there was, you know, something that could be done, you understand what I'm saying ... you know, even though it's not on the up and up, you know what I'm trying to get to ... If I could just bring something in.

Bill: I understand.

Harvey: You know, if I had guarantee, and I don't want to blow the money.

Bill: We can't, first of all, we don't have any guarantee, and secondly, I don't think we are in a position with Don or Brunton to pull that off right now.

Harvey: You don't think so.

Bill: I really don't. I really don't. Even if I did, it would really, you know, I mean when I mentioned it to Paul, Paul said I think we ought to call the FBI and let them know.

Harvey: Yeah. I'm talking about just between me and you. You know, nobody else knows about it. You know what I'm saying.

Bill: Because Don's not in the picture any more, so to speak, and because the OSBI is in town investigating the sheriff, I think the timing is bad and I would have to say I am not ... First of all, I am not even in a position to say if I would do that if it were a perfect circumstances. I said it to Paul that day in kind of a, "you know, I don't know where Don Nelson is coming from" if he really meant that or not. So, I am not sure that was even a valid option, it was never discussed, never broached.

Harvey: Never again. You just had the one talk with him. I'm just trying to find what can be done. Do you think you might pursue it a little bit more to see what might become of that option?

Bill: Uh, I really, I don't know. I really don't think it's a smart time to consider that Harvey.

Harvey: You don't. Okay. That's what I'm asking you.

Bill: The concern being Don doesn't have the control of this case. It is Max's case. He is going to try it.

Harvey: Yeah.

Bill: So, you know, I ... there's other cases, I anticipate the three in front of it going away and Max will be on it. Whether he's in a position to try it versus another case. I'm not sure.

Harvey: Uh-huh.

Bill: Carol Listen might be the one that gets it, I have ... I have ...

Harvey: There's no way Don Nelson could come back to the picture then.

Bill: I think Don flat told Max "I'm not trying it." I really think Don flat said "I'm not try[ing] it because I don't like Randy and Don Wood and I'm not going to go down there and try hard enough to get Harvey convicted."

Harvey: Uh Huh. I don't know how good a friends you are with these people. You know, could it be that you maybe could go and talk to Don, you know, over the weekend or at his house or wherever that would be at and you know if he could get back on it. You know, you say Don's on it, and that would be the key, I could just come down in there and make the end of the discussion. You know what I'm saying?

Bill: I, I think at this point in time that is not an option.

Harvey: You're saying its' not an option.

Bill: One of my concerns is all the FEDS hanging around town right now.

Harvey: Yeah.

Bill: Bad timing. Bad timing. And, I don't know that I could do that even Harvey.

Harvey: You don't know if you could do it. See, I don't know what your position is. You know?

Bill: You know that's really a ...

Harvey: But you know for him to bring it up, now he probably had to be, you know, I would think he is serious, you know? How serious, that's a different thing.

Bill: Exactly. And see I think, I think in the back of my mind that kind of shit goes on around here all the time.

Harvey: Yeah.

Bill: It may be that Don Nelson is sizing me up. See, I['ve] been out here long enough now that guys are starting to know me.

Harvey: Uh-huh.

Bill: You know, but I don't play those games very well.

Harvey: Yeah.

Bill: Cause as soon as you start that shit, then the next time someone wants a favor you don't have any choice.

## II. RECOMMENDATIONS FOR DISCIPLINE

¶ 8 Two members of the Tribunal, composing the majority report, recommended Respondent receive no discipline, stating that he did not violate the Rules of Professional Conduct or Rules Governing Disciplinary Proceedings despite his stipulations to the contrary. In finding the bar association failed to establish the violations by clear and convincing evidence, the majority Tribunal report stated:

> There [was] no evidence that Respondent ever indicated that bribery be attempted or ever brought up the subject to discuss with his client except upon advice of Paul Brunton that the client be notified of the conversation with the assistant district attorney. The record reflects clearly that Respondent had no intent to participate in any such illegal or unethical conduct.
>
> . . .
>
> While the Respondent may have exercised poor judgment in failing to properly show indignation and castigate Capstick for his suggestions of bribery, this lack of action does not constitute misconduct as defined by the rule and law of the State of Oklahoma.

¶ 9 Even the minority Tribunal report, in recommending public censure, found no vio-

lation of Rule 8.4(e) and prefaced its recommendation for discipline on Rules 8.4(a) and (d), for acts prejudicial to the administration of justice.

> It should be clear that Respondent allowing Capstick to continue to believe that the judicial system in Creek County was subject to being influenced improperly by the payment of funds is conduct that is prejudicial to the administration of justice.

With regard to 8.4(e), the minority's report points out that "even when encouraged by Capstick to continue discussing the possibility of a bribe, at no time did Respondent indicate to Capstick that a bribe was a viable option to disposing of his case or agree to pursue same further."

## III. DISCUSSION

■ ¶ 10 While the Court agrees with the Tribunal members that the evidence indicates Respondent did not intend to participate in an attempted bribery of a governmental official, this finding does not bear on the question of whether Respondent violated Rule 8.4(e). The rule does not require the bar association to establish that Respondent actually intended to bribe a public official. An attorney can violate 8.4(e) by either stating or implying an ability to improperly influence a governmental official, whether there was ever any intent to exercise that influence or not. Respondent implied several times during the course of his September 11th conversation with Capstick an ability to improperly influence the district attorney. In this regard he stated:

> . . . This is a bad time to be doing something like that with those kind of people laying around. Don Nelson might [inaudible] if we did something like that. Forget it with Max because it's not Don's case. I don't know if Don has the power to do that now, Okay? . . . .
>
> . . . We can't, first of all, we don't have any guarantee, and secondly, I don't think we are in a position with Don or Brunton to pull that off right now. . . .
>
> . . . Because Don's not in the picture any more, so to speak, and because the OSBI is in town investigating the sheriff, I think the timing is bad and I would have to say I

am not [inaudible] First of all, I am not even in a position to say if I would do that if it were a perfect circumstances....

... Bad timing. Bad timing. And, I don't know that I could do that even Harvey....

¶ 11 In these statements Respondent postured an ability to Capstick to influence the district attorney, but stated that the risks at that point made it an inopportune time to exercise that influence. In this case, Respondent's comments served only to cement Capstick's already jaundiced view of the legal system. They were especially ill advised given Capstick's prospect of continued contact with the Creek County justice system. Respondent stipulated his comments violated Rule 8.4(e). Accordingly, we find the bar association established by clear and convincing evidence that Respondent violated Rule 8.4(e) of the Rules of Professional Conduct and is therefore subject to the imposition of professional discipline under Rule 1.3 of the Rules Governing Disciplinary Proceedings.[3]

¶ 12 With regard to the bar association's asserted violation of 8.4(d), we do not find that Respondent's conduct actually prejudiced the administration of justice and decline to rest this public censure on a violation of 8.4(d).

### IV. MITIGATION

¶ 13 There are several important factors which mitigate in favor of Respondent. Capstick instigated the inappropriate discussions on September 11th and 13th with the express purpose of luring Respondent into making incriminating statements on tape; Respondent would not have broached the subject in either conversation were it not for Capstick's probing. Similarly, the transcripts indicate that Respondent never intended to improperly influence a district attorney. Perhaps most importantly, Respondent has expressed extreme remorse and accepted responsibility for his comments and his poor judgment in dealing with Capstick. Respondent has practiced for more than ten years and has no

previous disciplinary contacts with the bar association. Finally, as the bar association and the complete Tribunal note, Respondent's continued practice of law does not jeopardize the public or legal profession, because there appears to be no danger he will repeat his misconduct.

### V. DISCIPLINE

¶ 14 This Court possesses original and exclusive jurisdiction in bar disciplinary proceedings. Rule 1.1 RGDP. This Court's review is by *de novo* consideration of the entire record. *State ex rel. Oklahoma Bar Ass'n v. Weeks,* 1998 OK 83, ¶ 12, 969 P.2d 347, 351. Although the Court is not bound by the recommendations of either the bar association or the Tribunal, the Court often considers these recommendations in its own analysis and formulation of an appropriate discipline.

¶ 15 The bar association's analysis and approach to discipline in this case is focused on Rule 8.4(e), the implication that Respondent could improperly influence a public official. The cases which the bar analogizes to Respondent's conduct are similarly focused on Rule 8.4(e). *State ex rel. Oklahoma Bar Ass'n v. Evans,* 1987 OK 108, 747 P.2d 277; *State ex rel. Oklahoma Bar Ass'n v. Hall,* 1977 OK 117, 567 P.2d 975; *State ex rel. Oklahoma Bar Ass'n v. Scanland,* 1970 OK 94, 475 P.2d 373; and *State ex rel. Oklahoma Bar Ass'n v. James,* 1969 OK 119, 463 P.2d 972. While the Court agrees the bar association's focus on Rule 8.4(e) is appropriate, we do not feel the cases which the bar relies upon are sufficiently analogous to offer constructive guidance in Respondent's case.

¶ 16 *Evans* involved an attorney who asked his client if he would be willing to make a "campaign contribution" to certain public officials in order to prevent the filing of charges. Evans said he made the offer only to test the client's assertions of innocence. Evans did not fully cooperate with the bar's

---

3. Rule 8.4(a) RPC:
   violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

The Court also finds Respondent violated Rule 8.4(a) which arises from its analysis of Respondent's Rule 8.4(e) violation. The facts which support the 8.4(e) violation serve as the foundation of Respondent's violation of 8.4(a).

investigation of the matter, exacerbating his punishment. He received a four year suspension from the practice of law.

¶ 17 Unlike Evans, Respondent in this proceeding did not initiate a bribery "offer". Respondent first mentioned the "offer" to Capstick, not to ask if Capstick would be willing to engage in any such activity, nor to encourage any suggestion of illegal activity, but instead to inform his client of the exchange. When Capstick brought it up again weeks later in an attempt to bait Respondent, Respondent never reacted positively to the suggestion and although he did not condemn Capstick's overtures as he should have, Respondent was obviously unreceptive to Capstick's requests. *Evans* is not as analogous as the bar association asserts.

¶ 18 The other three cases, *Scanland, Hall* and *James*, involve violations of the law and contain far more serious allegations than the instant case. In *Hall*, former Governor David Hall was tried and found guilty of extortion, conspiracy and bribery. In *James*, Judge Otis James was accused of soliciting a bribe on two occasions while he was a county judge. In *Scanland*, an assistant district attorney offered to pay a police detective to destroy all records of an arrest. All three of these cases involved members of the bar who committed or attempted to commit bribery or extortion. These cases simply do not shed light on an appropriate discipline for Respondent and our review of other bar disciplinary cases did not produce any cases with similar misconduct to that which is alleged here.

■ ¶ 19 This Court's primary function is to protect the public and determine an attorney's continued fitness to practice law, not to punish. *State ex rel. Oklahoma Bar Ass'n v. Donnelly*, 1992 OK 164, 848 P.2d 543, 546. However, often discipline serves the interests of the public due to its deterrent factor. Even when the subject attorney does not need such a deterrent to prevent continued misconduct, the interest of explaining the Court's expectations of professional legal practice may necessitate a more public form of discipline than that offered by a private reprimand. *Donnelly*, 848 P.2d at 547; *State ex rel. Oklahoma Bar Ass'n v. Mayes*, 1999 OK 9, 977 P.2d 1073, 1081–82.

¶ 20 This need to educate the bar as a whole, coupled with Respondent's extremely troublesome conduct in his approach to Capstick, compels the Court to impose a public censure. Our review of existing cases did not reveal a case of comparable misconduct to that committed by Respondent. The public is better served if the bar as a whole has the opportunity to understand the Court's expectations of professional legal practice when placed in a position similar to that in which Respondent found himself here.

## VI. CONCLUSION

¶ 21 Respondent is publicly censured. Respondent must pay the costs of the investigation and disciplinary proceedings in the amount of $531.26 within ninety (90) days of the effective date of this opinion, pursuant to Rule 6.16 of the RGDP.

¶ 22 RESPONDENT PUBLICLY CENSURED AND ORDERED TO PAY COSTS.

¶ 23 HODGES, LAVENDER, KAUGER, SUMMERS, and WINCHESTER, JJ. concur. HARGRAVE, C.J., WATT, V.C.J. and OPALA, J. dissent.

OPALA, J., dissenting.

¶ 1 Today's ruling—that certain respondent's communications with his client violated Rule 8.4(e) [1]—offends the free speech guarantee of Art.2 § 22, Okl. Const.[2] Respondent may not be disciplined for utterances that so clearly fall within the rubric of protected political speech.[3] Section 22, whose

---

1. The pertinent terms of the Rules of Professional Conduct, 5 O.S.1991 Ch. 1, App. 3–A, include:

   "It is professional misconduct for a lawyer to: ... state or imply an ability to influence improperly a government agency or official;" * * *

2. The terms of Art. 2 § 22, Okl. Const., provide:

   "Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." * * *

3. *State ex rel. Oklahoma Bar Ass'n v. Porter*, 1988 OK 114, 766 P.2d 958, 970, (Opala, Justice, concurring in judgment). In the same context

language has an even broader sweep than that of the First Amendment,[4] absolutely shields the expressions which form the basis of this proceeding.

¶ 2 I do not suggest that a lawyer may not be disciplined for *soliciting, accepting or requesting* a bribe. I would gladly join the court if these were indeed the facts in this case. *It is one thing for a lawyer to state (or imply) to a client that he has the ability to influence a district attorney and then offer to do so; it is quite another for a lawyer not to rule out that a district attorney (or any other government official) might be subject to improper influences.* There is no affirmative proof here that respondent ever intended to participate in any illegal conduct—a view which both the PRT panel and this court share. Respondent's failure firmly to reject the possibility of government corruption is undoubtedly protected by national and state free-speech guarantees. As a comment on the operation of governmental affairs, the matter plainly lies at the heart of political speech.[5]

¶ 3 By accepting a license to practice law, Bar members are required no more than to conduct themselves in a manner that is consistent with lawful behavior and be compatible with orderly administration of judicial process;[6] *they are neither expected nor required to relinquish fundamental constitutional freedoms.* The court's pronouncement imposes upon a licensed Oklahoma legal practitioner the *affirmative duty* to stand "four square" for the purity of criminal law enforcement process and to whitewash it even when a doubt may exist. The lawyer is forced affirmatively to assert that all is well with the prosecutorial service; he is free *neither* to suspect *nor* to be apprehensive that, in fact, things are not so well. Implicit in the expected affirmations is the disturbing notion that lawyers must serve as enthusiastic cheerleaders for the government. I view § 22 as commanding the government to maintain the very same neutrality that the U.S. Supreme Court has found to be embodied in the First Amendment's protection of free expression.[7] Had respondent been vocally denying the possibility of any corruption in the prosecutor's office, no disciplinary action would likely have followed and this case would not have been called to our attention.

¶ 4 By counseling the court that respondent's comments are indeed shielded, I do not mean to condone his failure affirmatively to state that he would not participate in any improper action. What I emphatically and firmly advance is that professional discipline should not be invoked to chill free speech. Today's opinion places a higher burden on a practitioner than any licensed legal professional may be required to bear in the constitutional order of our free society.

¶ 5 Lawyers are not government mouthpieces to be programmed for incantation of an absolution mantra that will sanctify officialdom in power.[8] The court's pronouncement reduces them to the very same status they were forced to endure in the most repressive totalitarian regimes of yesteryear's Europe. I cannot countenance a decisional

see *In re Snyder,* 472 U.S. 634, 646–47, 105 S.Ct. 2874, 2882, 86 L.Ed.2d 504 (1985).

For an analysis of the balance between attorneys' speech and First Amendment rights see *The First Amendment and Attorney Discipline for Criticism of the Judiciary: Let the Lawyer Beware,* 15 N.Ky.L.Rev. 129 (1988).

**4.** *Gaylord Entertainment Co. v. Thompson,* 1998 OK 30, ¶ 13, 958 P.2d 128, 139.

**5.** "Political speech is .. any expression concerning the ideas and art of governing." *Gaylord Entertainment Co. v. Thompson, supra* note 4 at ¶ 14, 958 P.2d at 139. "Political speech" is the term used to encompass all of "those activities of thought and communication by which we govern." *See* Alexander Meiklejohn, *The First*

*Amendment is an Absolute,* 1961 SUP.CT.REV. 245, 255.

**6.** *In re Snyder, supra* note 3.

**7.** *R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

**8.** "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).

course that turns the Bar into mindless champions for government-dictated orthodoxy.