2003 OK 23

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Robert I. MAYES, Jr., Respondent.**

**No. SCBD4720.**

Supreme Court of Oklahoma.

March 11, 2003.

See also 977 P.2d 1073.

Nathan A. Lockhart, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

Robert I. Mayes, Jr., Tulsa, OK, Pro se.

KAUGER, J.:

¶ 1 The complainant, Oklahoma Bar Association (Bar Association), charged the respondent, Robert I. Mayes, Jr., with two counts of professional misconduct involving the mishandling of settlement funds[1] and failure to cooperate in the grievance process.[2]

---

1. Rule 1.4, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A provides in pertinent part:

> ... (b) Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services.
> (c) Theft by conversion or otherwise of the funds of a client shall, if proved, result in disbarment. . . . "

Rule 1.15(b), Rules Governing Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A provides:

> "... (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property. . . . "

2. Rule 5.2, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1 A, providing in pertinent part:

Upon a *de novo* review,[3] we hold that clear and convincing evidence[4] supports findings of the respondent's misappropriation of settlement funds belonging to two minors and his failure to cooperate in the grievance process. Further, we determine that the respondent's misconduct, his prior disciplinary history and discipline administered in similar cases warrants disbarment and the payment of $653.57 in costs.[5]

## AGREED FACTS[6]

¶2 Both counts arise from the respondent's handling of an estate and his settling of a wrongful death claim on the estate's behalf. Yolanda King (mother/decedent) was killed in a car accident on November 27, 1997, leaving two minor children, Y.K. and D.J.B. On January 15, 1998, the respondent filed a Petition for Letters of Administration on behalf of the mother's estate listing her two children as heirs. Eunice King (King) was appointed administrator on March 6, 1998.

¶3 Thomas G. Scott (Scott) undertook representation of one of the children, D.J.B., filing an application to set bond for an inventory on April 28, 1998. The next month, the probate court ordered King to submit any settlement offers for approval. On August 19 and August 31, 1998, respectively, the respondent filed a petition to settle the personal injury claim and an application for an order approving a settlement of $30,000.00 composed of offers of $10,000.00 from three different insurance companies, Progressive, GEICO and Metropolitan Property and Casualty. The probate court entered an order approving the settlement on August 31, 1998. Between September 1 and September 18, 1998, three checks from the three different insurance companies were deposited in the respondent's trust account for a total of $29,975.00.[7]

¶4 On September 2, 1998, the respondent filed an application for payment of his attorney fee. The respondent indicated that he had a contingency fee contract with King for one-third of the settlement proceeds and that $30,000 had been deposited in the respon-

"After making such preliminary investigation as the General Council may deem appropriate, the General Counsel shall ... file and serve a copy of the grievance ... upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance ... or such further time as may be granted by the General Counsel, shall be grounds for discipline...."
Rule 3.3, Rules Governing Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A provides in pertinent part:
"(1) A lawyer shall not knowingly:
(a) make a false statement of fact or law to a tribunal ..."
Rule 8.4, Rules Governing Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A provides in pertinent part:
"It is professional misconduct for a lawyer to: ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation ..."

**3.** *State ex rel. Oklahoma Bar Ass'n v. Phillips,* 2002 OK 86, ¶2, 60 P.3d 1030; *State ex rel. Oklahoma Bar Ass'n v. Erickson,* 2001 OK 66, ¶14, 29 P.3d 550; *State ex rel. Oklahoma Bar Ass'n v. Israel,* 2001 OK 42, ¶13, 25 P.3d 909;

*State ex rel. Oklahoma Bar Ass'n v. Smolen,* 2000 OK 95, ¶7, 17 P.3d 456.

**4.** Rule 6.12, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Phillips,* see note 3 at ¶15, supra; *State ex rel. Oklahoma Bar Ass'n v. Wolfe,* 1997 OK 47, ¶1, 937 P.2d 988; *State ex rel. Oklahoma Bar Ass'n v. Holden,* 1995 OK 25, ¶1, 895 P.2d 707.

**5.** Rule 6.16, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

**6.** The respondent admitted all facts as outlined in the Bar Association's complaint except for those contained in two paragraphs—one which related to the deposit of the $33,000.00 check on June 25, 2001, from American Airlines to the respondent's trust account and one regarding his suspension for failure to comply with Rules for Mandatory Continuing Legal Education, 5 O.S. 2001, Ch. 1, App. 1–B and the recommendation for discipline.

**7.** Evidently, the difference between what would normally be a total of $30,000.00 and the $29,975.00 had to do with one of the insurance companies having made payment through a draft rather than a check resulting in banking charges being assessed against the respondent's trust account.

dent's trust account held at State Bank, N.A.[8] The probate court approved the requested fee on September 16, 1998.

¶ 5 The respondent deposited almost $30,000.00 to his trust account for the settlement of the wrongful death action. However, no payments were made to either of the decedent's minor children. Further, although the probate court approved his request for fees, no check in the amount of the approved fees was drawn on the trust account. As early as September 30, 1998, there were insufficient funds in the trust account to issue checks of $10,000.00 to each of the minor children. Over the next eight months, the trust account was depleted until it became overdrawn in April of 1999.

¶ 6 On February 23, 1999, we issued our opinion in State ex rel. Oklahoma Bar Ass'n v. Mayes (Mayes I), 1999 OK 9, 977 P.2d 1073, suspending the respondent for six months for failing to supervise a non-lawyer office manager and unwittingly receiving some of his client's personal injury settlement proceeds which were converted or commingled by the office manager. Despite his suspension, the respondent did not formally withdraw from the probate of the deceased's estate.[9] Nevertheless, he may have notified his clients of his inability to practice law. On June 4, a pro se motion for continuance was filed indicating that the respondent was unable to practice law until after August 16, 1999.

¶ 7 Scott filed a second request for an accounting on October 26, 1999, and a hearing was set for November 23rd. On the day of the scheduled hearing, the respondent filed another motion for continuance indicating that he had suffered a heart attack and would be unable to work or attend the hearing. The hearing was reset for January 25,

2000, but a review of the pleadings does not indicate the hearing took place.

¶ 8 King filed a final accounting in the deceased's estate on October 20, 2000, which she signed personally and which was notarized by the respondent's secretary. The accounting indicated that: the decedent's estate received $30,000.00 in an insurance check for negligence on August 31, 1998; an expenditure of $9,999.99 as attorney fees to the respondent on September 25, 1998; a cash balance of $19,700.60 existed in the estate as of November 22, 1999, with the balance being on deposit in State Bank, Tulsa, Oklahoma.

¶ 9 The respondent's trust account records do not support the representation in the accounting. Three days before the accounting was filed, the respondent's trust account had a balance of $250.00. By October 31, 2000— eleven days after the accounting was filed, the balance had shrunk to $60.61. At no time during this time period did the balance of the account approach $20,000.00 as was represented by the accounting. Further, there was no single withdrawal for attorney fees in the amount of $9,999.99.

¶ 10 On November 28, 2000, the respondent filed a second motion for continuance in the probate action indicating he had diabetes, was participating in dialysis and had undergone surgery. Six months later, Scott filed an exception to the final accounting on behalf of D.J.B. requesting that the accounting be updated and that the respondent should be required to attest to the accounting filed with the court.

¶ 11 The respondent deposited a check from American Airlines, Inc. to Blanche and Robert Mayes for $33,000.00 in his trust account on June 25, 2001. It is unclear whether the check represented the respon-

---

8. Application for payment of attorney fee filed on September 2, 1998, providing in pertinent part:

   "... 2. Eunice King entered into a contingency fee contract with applicant concerning the wrongful death action in this case for thirty-three and one-third percent (33 1/3%) of the settlement amount. On August 31, 1998, the wrongful death action was settled in open Court for Thirty Thousand Dollars ($30,000). **The money has been deposited into the firm's client trust account held at State Bank, N.A.**

   .... 4. WHEREFORE PREMISES CONSIDERED, Applicant Robert Issac Mayes, Jr. prays this Court authorize the release of Nine Thousand Nine–Hundred Ninety–Nine Dollars and Ninety–Nine Cents to him as his rightful, reasonable and lawful attorney fee, from the **Thirty Thousand Dollars currently held in Trust in this matter....**" [Emphasis supplied.]

9. Rule 9.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

dent's personal funds or related to his legal practice. Before the deposit, the trust account had a balance of only $60.61. Two days after the deposit, the respondent issued a check payable from his trust account to Scott and D.J.B.'s father in the amount of $9,850.00. The memorandum portion of the check indicated that it was a part of the settlement of the mother's estate. At that time, no funds had been paid on behalf of Y.K., the decedent's second minor child.[10]

¶ 12 Scott filed a grievance with the Bar Association on June 8, 2000. The grievance and a request for a response were forwarded to the respondent on August 1, 2000. On September 29, 2000, when no answer was forthcoming, the Bar Association sent the respondent a second letter requesting information regarding the grievance and a response within 5 days. The Bar Association granted the respondent an extension to October 24th for his response on October 4th. On October 25, 2000, the respondent sent the Bar Association a letter indicating: 1) that he had not answered previously because he was sick and didn't know a complaint had been filed; and 2) Scott had acted unethically by contacting his clients. There was no substantive response to any questions related to the handling of the personal injury funds or an explanation of why the decedent's minor children had not received their proportionate shares of the wrongful death settlement.

¶ 13 Almost a year following the respondent's original notification of the grievance and a request to provide information, the Bar Association's investigator again wrote the respondent asking for information regarding his trust account and the disbursal of funds. The respondent did not answer. Subsequently, on October 29, 2001, and again on January 23, 2002, the Bar Association was forced to issue subpoenaes to the respondent's banking institution to get a financial picture of the facts in the cause.

¶ 14 On May 10, 2002, the Bar Association filed this cause as a Rule 6 proceeding.[11] Although the respondent relies on his poor health as an excuse for his behavior, he did not interpose a Rule 10 defense.[12] A hearing was conducted before the trial panel on August 23, 2002, at which the respondent and the Bar Association's investigator were the only witnesses. On September 12, 2002, the trial panel filed its report relying on the respondent's testimony and the agreed stipulations of the parties. It found clear and convincing evidence to support charges of the mishandling of the trust account and failure to make a full, fair and timely response to the investigation. Although the respondent argued for a suspension of two to three years as an appropriate sanction,[13] the trial panel

---

10. The respondent made a partial payment to Y.K. of $4,000.00 on the day of the hearing before the trial panel.

11. Rule 6, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

12. Rule 10.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A provides in pertinent part:

"The term 'personally incapable of practicing law' shall include:
(A) Suffering from mental or physical illness of such character as to render the person afflicted incapable of managing himself, his affairs or the affairs of others with the integrity and competence requisite for the proper practice of law ..."

The respondent has not here and did not in *State ex rel. Oklahoma Bar Ass'n v. Mayes (Mayes I )*, 1999 OK 9, ¶ 20, 977 P.2d 1073, assert that his health was so deteriorated as to meet the definition of "personally incapable of practicing law" contained within Rule 10.1, this note, supra. Although there may be situations where it is appropriate to consider an attorney's health condition as a mitigating factor, a health condition in itself is not enough to mitigate discipline. See, *State ex rel. Oklahoma Bar Ass'n v. Doris*, note 34 at ¶ 39, infra.

13. Transcript of proceedings, August 23, 2002, the respondent's remarks to the trial panel, providing in pertinent part at pp. 19–20:

"... MR. DELASHAW: Mr. Mayes, since you're presently under oath and the—just we discussed, why don't you go ahead and tell us what you'd like us to hear regarding what we're proposing to do here today and what kind of recommendations that we should make to the Supreme Court, based upon all the stuff that we've been hearing.
THE WITNESS: Yes, sir. I don't think you should disbar me. I don't think you should disbar me. Three—two—three years is enough. I've learned my lesson. I—I can't work right now because of my dialysis. I have two or three—three times a week. Tuesday, Thursday and Saturday, I have dialysis four-and-a-half hours...."

recommended disbarment and the imposition of costs. The respondent filed no brief in response to this Court's order of September 17, 2002. On November 8, 2002, the Bar Association filed an unopposed application to assess costs. The record was completed on February 11, 2003, with the Bar Association's filing of a copy of the respondent's answer pursuant to our order.

## I.

¶ 15 **CLEAR AND CONVINCING EVIDENCE SUPPORTS DETERMINATIONS OF MISMANAGEMENT OF A TRUST ACCOUNT AND FAILURE TO COOPERATE IN THE GRIEVANCE PROCESS.**

¶ 16 The trial panel and the Bar Association agree that clear and convincing evidence supports the charges of mismanagement of a trust account and uncooperativeness in the investigative process by being untimely in responding and neglecting to make a full and fair disclosure. The respondent has not filed a brief in this cause despite our order of October 7, 2002. Nevertheless, the facts stipulated to by the respondent support the alleged charges. Further, a *de novo* review leaves us convinced that the Bar Association has met the burden of proof necessary to support the imposition of discipline.

¶ 17 In disciplinary matters, this Court possesses exclusive original jurisdiction.[14] We are not bound by agreed findings, conclusions of law or recommendations for discipline.[15] Rather, the ultimate responsibility for imposition of professional discipline is ours alone. The Court's review is *de novo*

in considering the record presented as well as the recommendations for discipline.[16] Before we may impose discipline upon an attorney, the charges must be established by clear and convincing evidence.[17]

¶ 18 When money is entrusted to an attorney, the latter's fiduciary duty is to apply the funds strictly to the purpose intended.[18] Three levels of culpability are employed when an attorney mishandles client funds with ascending degrees of seriousness. The least offensive—commingling—occurs when an attorney fails to keep client moneys in an account separate from that of the attorney. The next serious offense—simple conversion—exists when the attorney uses client funds for a purpose other than that for which they are intended. Finally, an attorney commits misappropriation when the lawyer purposefully deprives a client of moneys through deceit and fraud.[19]

¶ 19 Although it may be difficult to discern between the three levels of misconduct, here it is clear that more is at issue than a mere commingling of client funds. Bank records for the time frame during which the respondent indicated he had deposited the insurance proceeds to his account show that the balance of the account did not approach $30,000.00. Even before the probate court approved the respondent's fee of one-third of the recovery, the balance of the account was well below $20,000.00—the amount it would presumably have required for distribution to the decedent's two minor children. The subpoenaed records disclose that, at the same time the respondent should have been holding funds for the minors, the balance was

---

14. Rule 1.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 4, supra; *State ex rel. Oklahoma Bar Ass'n v. McMillian*, 1989 OK 16, ¶ 5, 770 P.2d 892.

15. *State ex rel. Oklahoma Bar Ass'n v. Erickson*, 2001 OK 66, ¶ 14, 29 P.3d 550; *State ex rel. Oklahoma Bar Ass'n v. Israel*, see note 3, supra.

16. *State ex rel. Oklahoma Bar Ass'n v. Israel*, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Bolusky*, 2001 OK 26, ¶ 14, 23 P.3d 268; *State ex rel. Oklahoma Bar Ass'n v. Dershem*, 2001 OK 7, ¶ 12, 21 P.3d 639.

17. Rule 6.12, Rules Governing Disciplinary Proceedings, see note 4, supra; *State ex rel. Oklahoma Bar Ass'n v. Wolfe*, see note 4, supra; *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 4, supra.

18. *State ex rel. Oklahoma Bar Ass'n v. Busch*, see note 20 at ¶ 43, infra.

19. *State ex rel. Oklahoma Bar Ass'n v. Phillips*, 2002 OK 86, ¶ 15, 60 P.3d 1030; *State ex rel. Oklahoma Bar Ass'n v. Dunlap*, 1994 OK 81, ¶¶ 13–16, 880 P.2d 364; *State ex rel. Oklahoma Bar Ass'n v. Cummings*, 1993 OK 127, ¶¶ 23–25, 863 P.2d 1164.

overdrawn on at least fifteen occasions and the account was assessed insufficient fund fees.[20] The respondent testified that he used the funds to live on and to pay his secretary.[21] Undoubtedly, the facts support a finding of the second level of misconduct—conversion—the use of client funds for a purpose other than that for which they are intended.

¶ 20 Finally, although the Bar Association initially may have stipulated that the acts involved were mere conversion,[22] we are convinced that the most serious of money-related misconduct occurred—misappropriation. Misappropriation involves theft by conversion or otherwise when an attorney purposefully deprives a client of money by way of deceit and fraud.[23]

¶ 21 Although neither King, the children nor one of their representatives appeared at the hearing and there was no evidence that any client suffered economic harm because of the respondent's acts, documents either prepared by the respondent or with his assistance were filed with the probate court representing that the minors' funds were being held in the bank where the respondent had his trust account.[24] It is apparent that the respondent represented that he was holding monies intended for the two minor children when those funds had been misappropriated to his own use. Further, in conversations with the Bar Association's investigator, the respondent basically admitted that he had stolen the funds.[25]

¶ 22 The respondent's own actions have propelled him beyond the level of simple conversion and into the realm of misappropriation.[26] Further, the Bar Association

**20.** The issuance of overdrawn checks manifests an abiding disregard of the fundamental rule of ethics—that of common honesty. *State ex rel. Oklahoma Bar Ass'n v. Busch*, 1998 OK 103, ¶ 32, 976 P.2d 38.

**21.** Transcript of proceedings, August 23, 2002, Robert Mayes testifying in pertinent part at p. 44:
"... MR. DELASHAW: Okay. Mr. Mayes, would you like to offer anything else? Any final remarks?
MR. MAYES: When I got sick in 1999, I used the money to live on. I'm sorry.
MR. DELASHAW: You used the money to live on?
MR. MAYES: Yes. I'm sorry. I paid my secretary out of it...."

**22.** Transcript of proceedings, August 23, 2002, question of panel member to Bar Association and response providing in pertinent part at pp. 35–36:
"... MR. HERT: If I remember the opening statement that was made, you were—that the bar association's position was that conversion had been stipulated to by the parties; is that correct?
MR. LOCKHART: That's correct...."

**23.** *State ex rel. Oklahoma Bar Ass'n v. Busch*, see note 20, supra.

**24.** See, ¶ 8, supra.

**25.** Transcript of proceedings, August 23, 2002, Tony Blasier testifying in pertinent part at:
pp. 29–30 "... Q. Can you, in particular, recall a conversation you had with Mr. Mayes about what had happened?
A. Yes, sir. After the first subpoena duces tecum was served on the bank and the monthly statements, that are Complainant's Exhibit 9, were produced by the bank, I reviewed those records and determined that the trust account balance had fallen below what it should have been.
I then called Mr. Mayes and we talked about it. I told Mr. Mayes that—that I knew that he realized that we had subpoenaed the bank records and that the bank records had been produced and I believe one of the comments I made to him was—is I'm sure you know what those bank records reveal. And his response was that he knew what the bank records revealed.
I told him that—that it was obvious that the money had not maintain—had not been maintained in his trust account and that it looked to me like a theft had occurred and he confirmed to me, on the phone, that that was what had happened.
I told Mr. Mayes that I wanted to give him an opportunity, that if there was anything at all he could say or any evidence he could provide or if there was anything at all he could give me to explain this as being something other than a theft of money, that I wanted to give him that opportunity. And he told me that there was nothing that he could say or nothing that he could produce that would do that...."
p. 35 "... MR. HERT: So he didn't—except for that, there were no other opportunities for him to either cooperate or not?
THE WITNESS: Well, I would consider his admission to me that there had been a theft to be a certain level of cooperation...."

**26.** See, *State ex rel. Oklahoma Bar Ass'n v. Tully*, 2000 OK 93, ¶ 19, 20 P.3d 813 [Even when there has been no grave economic harm to a client, misappropriation may be found when an attor-

contacted the respondent three times with requests that he respond to the grievance before any response was forthcoming. Even then, the respondent did not provide a meaningful reply. Rather, he attached misleading documents to a four-sentence letter and accused Scott of misconduct for contacting represented parties.[27] A year later, because the respondent failed to comply with two requests for trust account records, the Bar Association was forced to issue two subpoenaes to his banking institution. Therefore, we determine that there is clear and convincing evidence of the respondent's misappropriation of settlement funds belonging to two minors and his failure to cooperate in the grievance process.

## II.

¶23 **THE RESPONDENT'S MISCONDUCT, HIS PRIOR DISCIPLINARY HISTORY AND DISCIPLINE IN SIMILAR CASES WARRANTS DISBARMENT AND THE IMPOSITION OF COSTS.**

¶24 The respondent argued at the hearing that disbarment is too severe a punishment for his actions, indicating that a two to three year suspension would be more appropriate.[28] He has not opposed the Bar

Association's application for costs. The Bar Association argues, and the trial panel recommended, that the respondent should be disbarred and required to pay costs of the proceeding. We agree.

¶25 Discipline is administered to preserve public confidence in the bar. Our responsibility is not to punish but to inquire into and gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts and of the legal profession. Discipline is imposed to maintain these goals rather than as punishment for the lawyer's misconduct.[29] Disciplinary action is also administered to deter the attorney from similar future conduct and to act as a restraining vehicle on others who might consider committing similar acts.[30] Discipline is fashioned to coincide with the discipline imposed upon other lawyers for similar acts of professional misconduct.[31] Although this Court strives to be evenhanded and fair in disciplinary matters, discipline must be decided on a case-by-case basis because each situation involves unique transgressions and mitigating factors.[32]

¶26 There can be little doubt that the respondent has brought discredit upon the legal profession subjecting himself to discipline.[33] Discipline in attorney miscon-

ney understands that the money he is utilizing belongs to a client.].

27. The respondent's letter of October 25, 2000, provides in pertinent part:

"... Regarding the grievance filed against me by Thomas G. Scott, first I am sick and I did not know he had filed a grievance so I did not receive it until you sent me a copy.
Second, Mr. Scott has been in contact with my client even with me as the attorney of record, and that is against the rules.
Third, here is the copy of the final report filed with the court.
If you have any questions please call me...."

28. See ¶14 and accompanying footnote #13, supra.

29. *State ex rel. Oklahoma Bar Ass'n v. Smith*, 1980 OK 126, ¶21, 615 P.2d 1014; *State ex rel. Oklahoma Bar Ass'n v. Lowe*, 1982 OK 20, ¶19, 640 P.2d 1361.

30. *State ex rel. Oklahoma Bar Ass'n v. Cummings*, see note 19 at ¶19, supra; *State ex rel. Oklahoma*

*Bar Ass'n v. Hall*, 1977 OK 117, ¶12, 567 P.2d 975.

31. *State ex rel. Oklahoma Bar Ass'n v. Patterson*, 2001 OK 51, ¶29, 28 P.3d 551; *State ex rel. Oklahoma Bar Ass'n v. Eakin*, 1995 OK 106, ¶0, 914 P.2d 644; *State ex rel. Oklahoma Bar Ass'n v. Bolton*, 1994 OK 53, ¶16, 880 P.2d 339.

32. *State ex rel. Oklahoma Bar Ass'n v. Doris*, see note 34 at ¶38, infra; *State ex rel. Oklahoma Bar Ass'n v. Rozin*, 1991 OK 132, ¶10, 824 P.2d 1127.

33. Rule 1.3, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1-A provides:

"The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline."

duct proceedings with facts similar to those present here has ranged from a public reprimand to disbarment.[34] Discipline should be

**34.** *State ex rel. Oklahoma Bar Ass'n v. Parsons*, 2002 OK 72, ¶ 21, 57 P.3d 865 [Attorney's improper disbursement from his attorney trust fund of insurance monies received in settlement of client's claims warranted one-year suspension for practice of law.]; *State ex rel. Oklahoma Bar Ass'n v. Abbott*, 2000 OK 64, ¶ 16, 11 P.3d 1239 [Public censure and payment of costs imposed for negligently commingling personal and trust account funds and failing to respond to the Bar Association's inquiry where the attorney also suffered from depression, acknowledged his wrongdoing and showed remorse.]; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2000 OK 35, ¶ 36, 4 P.3d 1242 [Attorney suspended for thirty days for mishandling insurance settlement proceeds belonging to a physician, failing to properly supervise employees and failing to timely and accurately respond to a grievance.]; *State ex rel. Oklahoma Bar Ass'n v. Doris*, 1999 OK 94, ¶ 43, 991 P.2d 1015 [Disbarment was appropriate for an attorney who intentionally misappropriated one client's funds, remitted funds to another client only after grievance had been initiated, made court appearances while intoxicated, and had been convicted of driving under the influence.]; *State ex rel. Oklahoma Bar Ass'n v. Stow*, 1998 OK 105, ¶ 31, 975 P.2d 869 [Three-year suspension was appropriate sanction for attorney's conversion of client funds, failure to provide timely accounting to Bar, and failure to answer disciplinary complaint.]; *State ex rel. Oklahoma Bar Ass'n v. Busch*, see note 20 at ¶ 52, supra [Disbarment appropriate sanction for attorney whose misconduct included: unauthorized use of client funds entrusted to attorney for a special purpose, issuing overdrawn checks to client, failing to communicate with clients, and lack of diligence in representing clients.]; *State ex rel. Oklahoma Bar Ass'n v. Patmon*, 1997 OK 62, ¶ 37, 939 P.2d 1155 [Attorney's payments from client trust account without client's permission, filing of frivolous lawsuits, and failure to properly respond to disciplinary grievances warranted suspension of two years and one day.]; *State ex rel. Oklahoma Bar Ass'n v. Gray*, 1997 OK 140, ¶ 30, 948 P.2d 1221 [Attorney's misappropriation of client and firm partnership funds for his personal use, and his failure to advise clients from whom he obtained loan to seek advice of independent counsel, warranted disbarment.]; *State ex rel. Oklahoma Bar Ass'n v. Briery*, 1996 OK 46, ¶ 1, 914 P.2d 1046 [Failing to appear in court after accepting fees, depositing court cost funds in attorney trust account, using funds to pay personal bills, failing to notify client that nothing had been done with case, commingling personal funds with client trust funds, and writing insufficient fund checks warranted suspension for two years and one day.]; *State ex rel. Oklahoma Bar Ass'n v. Lavelle*, 1995 OK 96, ¶ 1, 904 P.2d 78 [Misuse of settlement funds and engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation warranted disbarment.]; *State ex rel. Oklahoma Bar Ass'n v. Meek*, 1994 OK 118, ¶ 1, 895 P.2d 692 [Commingling and conversion of client funds without misappropriation, and misrepresentations to Bar Association in response to grievance, warrant suspension for one year and payment of costs.]; *State ex rel. Oklahoma Bar Ass'n v. Farrant*, 1994 OK 13, ¶ 15, 867 P.2d 1279 [Converting to different purpose client funds entrusted for specific purpose and knowingly misrepresenting facts to bar association warrants one-year suspension.]; *State ex rel. Oklahoma Bar Ass'n v. McManus*, 1993 OK 66, ¶ 13, 852 P.2d 727.[Public censure and payment of costs imposed where attorney failed to respond to a grievance, commingled personal funds in a trust account and neglected client matters and the discipline was recommended by both the trial panel and the Bar Association.]; *State ex rel. Oklahoma Bar Ass'n v. Miskovsky*, 1992 OK 40, ¶ 1, 832 P.2d 814 [Failing to keep records of trust fund account, converting client funds, and misrepresenting status of funds to trial court and opposing counsel warrants disbarment and imposition of costs.]; *State ex rel. Oklahoma Bar Ass'n v. Herlihy*, 1991 OK 123, ¶ 1, 827 P.2d 164 [Conversion of funds from settlement to personal use, failure to deliver those funds to client upon demand, and misrepresenting to court that trust account had been set up warrants disbarment.]; *State ex rel. Oklahoma Bar Ass'n v. Miskovsky*, 1991 OK 88, ¶ 18, 824 P.2d 1090 [Repeated mishandling of clients' funds without intention to steal, making single misrepresentation with respect to payment of client's medical bills, and exhibiting woefully sloppy, neglectful and at times incompetent record keeping constitutes professional misconduct warranting 18–month suspension.]; *State ex rel. Oklahoma Bar Ass'n v. Kessler*, 1991 OK 81, ¶ 0, 818 P.2d 463 [Commingling of client funds, use of clients' money for purposes other than those authorized, and misrepresentation to trial court that money has been used for its intended purpose, warrants two years and one day suspension.]; *State ex rel. Oklahoma Bar Ass'n v. Gasaway*, 1991 OK 33, ¶ 0, 810 P.2d 826 [Commingling and misusing client funds and failing to fully and fairly respond warrant one-year suspension.] *State ex rel. Oklahoma Bar Ass'n v. Payne*, 1988 OK 1, ¶¶ 4–6, 748 P.2d 989 [Failure to deposit client funds in a trust account sufficient to impose a public reprimand and the payment of costs.]; *State ex rel. Oklahoma Bar Ass'n v. Moore*, 1987 OK 21, ¶¶ 21–22, 741 P.2d 445 [Misappropriation of funds from estates in which attorney served as executor and attorney and negligent mishandling of affairs of clients warrants disbarment with imposition of costs incurred in disciplinary proceeding.]; *State ex rel. Oklahoma Bar Ass'n v. Raskin*, 1982 OK 39, ¶¶ 22–24, 642 P.2d 262 [Practice of deceit and neglect of clients' legal affairs, and the commingling and conversion of clients' funds, warrants disbarment.]; *State ex rel. Oklahoma Bar Ass'n v. Hensley*, 1977 OK 23, ¶ 12, 560 P.2d 567 [Attorney suspended

sufficient to persuade the attorney that such conduct will not be tolerated.[35] Mitigating circumstances may be considered in evaluating both the attorney's conduct and assessing the appropriate discipline.[36]

¶ 27 Other than the respondent's recognition that he acted badly and his expression of regret, there is little that can be said for the respondent in mitigation. One of the minor children, D.J.B., did not receive payment of the settlement proceeds until almost three years after the respondent deposited them in his trust account and this payment was made only after Scott demanded repeatedly an accounting. To date, the second minor child, Y.K., has received only $4,000.00 of the $10,000.00 he is entitled to receive—payment of this amount was not made until the day of the hearing before the trial panel—almost four years after the respondent deposited the settlement proceeds in his trust account. Restitution, in and of itself, will not mitigate the need for discipline.[37]

¶ 28 On the other hand, at precisely the same time that the respondent was mismanaging trust fund monies here, he was involved in the disciplinary process in a case not wholly unlike this cause. On February 23, 1999, we issued our opinion in *State ex rel. Oklahoma Bar Ass'n v. Mayes* (*Mayes I*), 1999 OK 9, 977 P.2d 1073, suspending the respondent for six months for failing to su-

pervise a non-lawyer office manager and unwittingly receiving some of his client's personal injury settlement proceeds which were converted or commingled by the office manager. Despite his suspension, the respondent did not formally withdraw from the probate of the deceased's estate.[38] Further, the respondent delayed the provision of trust records; issued a number of checks when funds were unavailable; and was not diligent in responding to the grievance inquiries. Finally, the respondent has been suspended both for failing to pay his Bar Association dues and for failure to complete rule-mandated continuing legal education.

¶ 29 Perhaps the most damning single piece of information mitigating against leniency is the special place of trust the respondent held with the decedent's family. Any lawyer, entrusted with a client's funds, must exercise the highest of fiduciary duties.[39] The respondent holds an even closer place of trust and confidence with King—he is her minister.[40]

¶ 30 This Court is the ultimate arbiter of appropriate sanctions in bar discipline cases.[41] We may choose to reject or to accept the trial panel's recommendations.[42] Here, the trial panel's suggested sanctions are appropriate. Therefore, we determine that the respondent's misconduct, his prior disciplinary history and discipline adminis-

for two years on charges of commingling where clients were deprived of their funds for approximately four months.]; *State ex rel. Oklahoma Bar Ass'n v. Kamins*, 1977 OK 103, ¶¶ 7–8, 568 P.2d 627 [The same discipline was imposed under similar circumstances where the client was deprived of funds for a period of one year.].

**35.** *State ex rel. Oklahoma Bar Ass'n v. Miskovsky*, 1997 OK 55, ¶ 15, 938 P.2d 744.

**36.** *State ex rel. Oklahoma Bar Ass'n v. Southern*, 2000 OK 88, ¶ 35, 15 P.3d 1; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2000 OK 35, ¶ 33, 4 P.3d 1242.

**37.** *State ex rel. Oklahoma Bar Ass'n v. Raskin*, see note 34 at ¶ 19, supra.

**38.** Rule 9.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

**39.** *State ex rel. Oklahoma Bar Ass'n v. Busch*, see note 20 at ¶ 42, supra. See also, *State ex rel. Oklahoma Bar Ass'n v. Wallace*, 1998 OK 65, ¶ 22, 961 P.2d 818.

**40.** Transcript of proceedings, August 23, 2002, Robert Mayes testifying in pertinent part at p. 20:

"... THE WITNESS: I receive Social Security to live on for $600 a month. I pay $250 a month back to the fund. I'm totally embarrassed about this. I knew Ms. King. She—I'm the minister at her church...."

**41.** *State ex rel. Oklahoma Bar Ass'n v. Rennie*, 1997 OK 108, ¶ 20, 945 P.2d 494; *State ex rel. Oklahoma Bar Ass'n v. Butler*, 1992 OK 150, ¶ 9, 848 P.2d 540.

**42.** *State ex rel. Oklahoma Bar Ass'n v. Rennie*, see note 41, supra; *State ex rel. Oklahoma Bar Ass'n v. Wilkins*, 1995 OK 59, ¶ 12, 898 P.2d 147.

tered in similar cases warrants disbarment and the payment of $653.57 in costs.[43]

## CONCLUSION

¶ 31 The nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law is solely vested in this Court.[44] Every lawyer is presented as a person worthy of competence and honesty in the performance of professional activities. It is our difficult duty to withdraw the license to practice law if necessary to protect the interest of the public, the legal profession and this tribunal.[45] Any other approach would rightly confuse or equate a lawyer's state franchise with a license to cheat the public.[46]

¶ 32 Although we may sympathize with the respondent's health conditions and the economic situation in which it has placed him, any empathy is offset by the fact that he may well have inflicted the same misery on two minor children who had already lost their mother. Upon a *de novo* review of the record, we determine that the respondent mismanaged his trust account and failed to cooperate in the grievance process. The respondent's misconduct warrants disbarment and the payment of $653.57 in costs.

**RESPONDENT DISBARRED; COSTS IMPOSED.**

ALL JUSTICES CONCUR.

---

**43.** The Bar Association submitted an application to assess costs of $653.57. The costs are itemized and copies of the bills associated with the proceeding are attached to the application. The respondent has not filed a response to the application. He is responsible for the costs of the disciplinary proceeding. Rule 6.16, Rules Governing Disciplinary Proceedings, see note 5, supra.

**44.** *State ex rel. Oklahoma Bar Ass'n v. Holden,* see note 4, supra; *State ex rel. Oklahoma Bar Ass'n v. Farrant,* 1994 OK 13, ¶ 8, 867 P.2d 1279; *Tweedy v. Oklahoma Bar Ass'n,* 1981 OK 12, ¶ 4, 624 P.2d 1049.

**45.** *State ex rel. Oklahoma Bar Ass'n v. Raskin,* see note 34 at ¶ 22, supra.

**46.** *State ex rel. Oklahoma Bar Ass'n v. Miskovsky,* see note 34 at ¶ 15.