2008 OK 42

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Gregory Scott WILSON, Respondent.**

**SCBD No. 5091.**

Supreme Court of Oklahoma.

April 29, 2008.

**710**

Janna Dunagan Hall, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Benjamin McCullar, Shawnee, Oklahoma, for Respondent.

COLBERT, J.

¶1 Gregory Scott Wilson (Respondent) was admitted to the Oklahoma Bar Association in April 1998. The Bar alleges in one count in this disciplinary proceeding that Respondent violated the Oklahoma Rules of Professional Conduct (ORPC), Okla. Stat. tit. 5, ch. 1, app. 3–A (2001 & Supp.2007), and the Oklahoma Rules Governing Disciplinary Proceedings (RGDP), Okla. Stat. tit. 5, ch. 1, app. 1–A (2001 & Supp.2007).[1] The Bar has accused Respondent of forging a client's name to a settlement check and commingling and converting client trust funds.

¶2 Following a hearing, the Professional Responsibility Tribunal (PRT) concluded that the Bar failed to establish forgery, but proved by clear and convincing evidence that Respondent commingled and converted client trust funds. The PRT also concluded that

1. Unless the application of a rule to the conduct at issue in this disciplinary matter would be changed by a subsequent amendment, this opinion will cite to and quote from the most recent version of the Oklahoma Rules of Professional Conduct (ORPC), Okla. Stat. tit. 5, ch. 1, app. 3–A (2001 & Supp.2007), and the Oklahoma Rules Governing Disciplinary Proceedings (RGDP), Okla. Stat. tit. 5, ch. 1, app. 1–A (2001 & Supp. 2007).

Respondent's ignorance of the proper management of a client trust fund amounted to incompetent representation and that he had improperly loaned funds to a client. The PRT recommended a one year suspension, a recommendation joined by the Bar. Respondent requests a period of supervised probation in lieu of suspension because of mitigating factors.

## BACKGROUND

¶ 3 The parties have stipulated to 18 pages of facts. Respondent has also admitted that he violated Rules 1.15[2] and 8.4,[3] ORPC, and Rule 1.4,[4] RGDP.

## Misconduct

¶ 4 On July 28, 2000, Stella Jay filed a lawsuit against Ryan Green and Carl Green for injuries she suffered in two unrelated auto accidents occurring within two hours on the same day, August 3, 1998. Ms. Jay incurred medical bills as a result totaling $45,777.61. Ryan Green and Carl Green (who are apparently un-related) were the at-fault drivers in the two accidents.

¶ 5 Ms. Jay dismissed the attorney who initially represented her in the lawsuit and retained Respondent. Respondent filed his entry of appearance on September 18, 2000. Nothing relevant to this matter occurred until January 2002 when Respondent received two settlement checks from the liability insurers.

¶ 6 Respondent received a $10,000 check from Ryan Green's insurer and deposited the check into his trust account on January 7, 2002. The check was made payable to Ms. Jay and Respondent. Ms. Jay would have testified, if called, that she did not sign the check, was not notified of its receipt or deposit, and did not authorize Respondent to sign the check on her behalf. Respondent stipulated and testified that he notified Ms. Jay of the settlement and his receipt of the check and that she authorized him to place a representation of her signature on the check and deposit it.

¶ 7 Respondent received a $25,000 check from Carl Green's insurer on January 24, 2002. He deposited that check, made payable to Ms. Jay and Respondent among others, into his trust account without any endorsements. As of January 24, 2002, therefore, Respondent had received $35,000 on Ms. Jay's behalf and deposited those funds in his trust account, less his attorney

2. Rule 1.15, ORPC (Safekeeping Property), provides in pertinent part:
   (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation. * * * *
   (d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

3. Rule 8.4, ORPC, provides that "[i]t is professional misconduct for a lawyer" to violate the rules of professional conduct or "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

4. Until January 1, 2008, Rule 1.4, RGDP (Monetary Transactions), provided in pertinent part:
   (b) Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services.
   (c) Theft by conversion or otherwise of the funds of a client shall, if proved, result in disbarment.
   Rule 1.4, RGDP, was significantly revised as of January 1, 2008, and renamed "Controversies regarding fees." The gist of subsection b, as quoted above, is now Rule 1.15(f), ORPC, effective January 1, 2008.

fee of .$14,000 (40%). Because Ms. Jay's accumulated medical bills exceeded the settlements with the two liability insurers, Respondent did not distribute the proceeds in the hope of recovering additional funds from the UM carrier.

¶ 8 On May 27, 2003, Respondent filed a lawsuit for breach of the duty of good faith and fair dealing on Ms. Jay's behalf against the UM carrier, GHS Property and Casualty Insurance Company. Ms. Jay settled her claim against GHS for $100,000 following mediation on that same day. Respondent received the first of two GHS checks, payable to Ms. Jay and Respondent, on June 30, 2003. Ms. Jay endorsed the $54,222.39 check and Respondent deposited it into his trust account.

¶ 9 Respondent immediately began disbursing the funds. All disbursements were from Respondent's trust account unless otherwise noted. He gave Ms. Jay a $1,500 check on June 30, 2003, and paid Oklahoma Mediation $615.62 on July 9, 2003. Respondent gave Ms. Jay a second check for $1,000 on July 23, 2003. On August 2, 2003, Respondent gave Ms. Jay a personal check for $500 because he did not have his trust account checkbook with him when he met with her away from his office.[5] Respondent gave Ms. Jay two additional trust account checks on August 4, 2003: for $19,862.67 and $2,138. That same day, he paid Ms. Jay's ex-husband $2,000 to settle his claim.[6]

¶ 10 Respondent received a second GHS check for $45,777.61 on August 28, 2003. Ms.

Jay gave Respondent permission to endorse this check and place it in his trust account. Respondent issued a check for $19,516.61 to Ms. Jay on August 29, 2003.

¶ 11 Ms. Jay still had outstanding medical liens of $45,777.61. Respondent filed a motion to extinguish the liens on August 29, 2003. He argued that the liens were time-barred and, in any event, applied only to the $21,000 Ms. Jay received from the liability insurers (net of his attorney fee). Only four providers, with liens totaling $25,737.56, appeared at the hearing on September 18, 2003. The judge noted that those four providers would receive about 82% of the total amount of each lien when the $21,000 was distributed. The judge also entered an order extinguishing the remaining liens. When the lienholders' attorney said he thought he could get the lienholders to waive the balance of their liens if they received the $21,000 immediately, Respondent wrote a check for that amount from his operating account. He subsequently reimbursed his operating account from the trust account.

¶ 12 According to Ms. Jay, Respondent repeatedly told her that all of her medical bills would "be taken care of." Respondent, on the other hand, denied this and stated that he told her she still owed the medical providers a balance of $4,737.56 and that she should wait to see if they would waive the rest.

¶ 13 When Respondent informed Ms. Jay that the medical providers refused to waive

---

**5.** Respondent explained the payment from his personal account this way:

> I met with [Ms. Jay] after the mediation, after the settlement. I met with her on a couple of occasions in Oklahoma City to sign settlement documents, do things related to finalizing and settling the case. On three separate occasions, she made requests for some funds. She, on each occasion, she would-her eyes would tear up and she would tell me that she didn't have any money. And she knew the money was coming and she needed some of the money and so I wrote her, on the first two occasions, out of the trust account, I happened to have it with me, probably because she called me and indicated she wanted me to come up there for that purpose.
>
> I know on the third time that she made that request, I think she was signing a release or something, that I went-came up to Oklahoma City to meet her for that purpose. I didn't

have a trust check with me. She was crying again, telling me she didn't have any money, she couldn't pay her bills, she needed some money and so I had my personal checkbook with me and I wrote her a $500 check out of my personal account.

**6.** A footnote in the stipulations explains the payment:

> This payment was made as part of a divorce settlement between Stella and Max Jay from a divorce decree entered on December 22, 2000. According to the Divorce Decree, Jay was to receive one-half (½) of the proceeds from Stella's personal injury claims or $22,258.64. Respondent later filed a Motion to Determine Separate Property in the divorce action on Stella's behalf. [He] later negotiated with Jay and Jay ultimately settled the claim for the $2,000.00 and signed a release to that effect.

the balance, she became upset. At that point she filed her complaint with the Bar. The medical providers ultimately filed suit against Ms. Jay, but their lawsuit was dismissed with prejudice and Ms. Jay was never required to pay the balance. Respondent did not delay any payments to Ms. Jay and she was not otherwise economically harmed by his actions.

¶ 14 The parties stipulated, however, that a problem with Respondent's trust account came to light during the investigation of Ms. Jay's complaint. Because Ms. Jay had not received any portion of the settlements with the two liability insurers in early 2002, $21,000 should have remained in Respondent's trust account until he began disbursing the proceeds. On August 29, 2002, Respondent paid a medical provider $378.50 on Ms. Jay's behalf, leaving $20,621.50 that should have remained in the trust account. On December 28, 2002, Respondent paid another medical provider $1,032 on Ms. Jay's behalf, leaving $19,589.50 that should have remained in the trust account. No other payments were made to Ms. Jay or on her behalf until June 30, 2003. In August 2002, however, the trust account balance fell and stayed below the required minimum until Respondent received the first check from GHS on June 30, 2003. Indeed, the month-end balance was below $1,000 at least three times and the account was charged seven times for insufficient funds in June 2003.[7] Respondent admitted he transferred money from his trust account to his operating account to cover business expenses and overhead.

### Enhancement

¶ 15 The parties also stipulated to the circumstances leading to the private reprimand previously levied against Respondent:

Respondent was hired by Cindy and Brian Schnackel in September, 2002, to file a breach of contract and fraud claim against a homebuilder. On January 21, 2003, the Schnackels terminated Respondent's services because Respondent was difficult to communicate with. Thereafter, despite knowing that he had been terminated, Respondent filed a lawsuit on the Schnackels' behalf. Moreover, Respondent attached a verification to the Petition upon which Respondent signed Brian Schnackel's name and directed his secretary to sign Cindy Schnackel's name. Respondent then had the same secretary notarize both false signatures.

The Bar recognized that Respondent's actions under scrutiny here took place before the actions that led to the prior discipline and that, since receiving the private reprimand, "Respondent has not signed the name of any client on any document," "has taken his ethical obligations to his clients seriously and has worked diligently to act in a professional manner to avoid further professional discipline and elevate the legal profession."

### Mitigation

¶ 16 The Bar and Respondent also stipulated to numerous facts in mitigation. Respondent responded in a timely manner when the grievance was filed and cooperated fully throughout the investigation. An audit of Respondent's 32 other personal injury cases determined that the trust account irregularities were limited to Ms. Jay's case. The parties also stipulated that Ms. Jay received $44,517.28 in settlement proceeds and that Respondent's advocacy resulted in her receiving over $43,000 more than she would have received otherwise. Respondent's ac-

7. Respondent's trust account balance, on a month-to-month basis, was as follows:

| Statement | Balance |
| --- | --- |
| Jan. 31, 2002 | $22,364.99 |
| Feb. 28, 2002 | $25,430.84 |
| Mar. 29, 2002 | $27,271.65 |
| Apr. 30, 2002 | $15,512.75 |
| May 31, 2002 | $22,391.58 |
| June 28, 2002 | $11,739.19 |
| July 31, 2002 | $ 7,513.23 |
| Aug. 30, 2002 | $16,095.20 |
| Sept. 30, 2002 | $ 5,463.78 |
| Oct. 31, 2002 | $ 4,184.95 |
| Nov. 29, 2002 | $ 4,574.68 |
| Dec. 31, 2002 | $ 862.05 |
| Jan. 31, 2003 | $ 1,882.53 |
| Feb. 28, 2003 | $ 930.63 |
| Mar. 31, 2003 | $ 3,684.34 |
| Apr. 30, 2003 | $ 3,495.32 |
| May 30, 2003 | $ 840.22 |
| June 30, 2003 | $54,602.43 |

tions did not deprive Ms. Jay or the medical providers of any funds. Respondent has also enacted office policies with the help of other attorneys and accountants to prevent this kind of commingling in the future.

¶ 17 The Bar further stipulated to an array of factors that contributed to Respondent's inattentiveness to his professional responsibilities. Respondent was "over-extended with civic and community responsibilities" during the relevant time period that "contributed to [his] inability to properly monitor his trust account." Respondent was the Mayor of the City of Tecumseh; President of the Pottawatomie County Bar Association; Chairman of the Pottawatomie County Democratic Party; Chairman of the Pottawatomie County Law Library Board; and on the board or executive board for Big Brothers/Big Sisters of Pottawatomie and Seminole Counties, the Tecumseh Chamber of Commerce, and the Tecumseh Growth and Development Authority. The Bar and Respondent also stipulated that he was distracted by "politically motivated" criminal charges that ultimately resulted in a verdict of not guilty. Respondent testified that no trust funds were spent on his criminal defense because his attorneys, including the attorney representing him here, did not charge him for their services.

¶ 18 Finally, the Bar stipulated that Respondent was over-extended with family obligations, including helping care for a special needs step-son, acting as the co-guardian of a young child, and acting as the foster and then adoptive parent of a teenager. Marital problems resulted in divorce three months after Respondent was cleared of the criminal

charges and Respondent now has sole custody of his adopted teenage daughter.

### Proceedings Before the PRT

¶ 19 At its hearing, the PRT considered the stipulations, documentary evidence, and the testimony of Respondent and Deanna Wilson (Respondent's mother), an attorney who keeps the accounts for Respondent's firm. The PRT concluded that the Bar had not proven by clear and convincing evidence that Respondent had forged Ms. Jay's name. However, it considered the evidence of forgery in light of Respondent's history of admitted forgery in conjunction with the evidence of commingling to find clear and convincing evidence that Respondent mishandled client funds and engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation" in violation of Rules 1.15 and 8.4, ORPC, and also applied a client's money in trust to a purpose other than that for which it was received in violation of Rule 1.4(b), RGDP.[8] The PRT also concluded that Respondent violated other rules in addition to those alleged by the Bar. The PRT found that he failed to give his client competent representation and made an impermissible loan to his client in violation of Rules 1.1[9] and 1.8(e),[10] ORPC. The PRT recommended a minimum of a one year suspension.

### STANDARD OF REVIEW

¶ 20 This Court has original, constitutional, exclusive, and non-delegable jurisdiction over all matters having to do with the admission or discipline of persons admitted to the practice of law in Oklahoma. Rule 1.1,

---

8. Until January 1, 2008, Rule 1.4(b), RGDP, stated, "Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose." Although that language no longer appears in Rule 1.4(b), Respondent admitted to violating this Rule and the conduct for which he is being disciplined occurred before the January 1, 2008, changes to the RGDP and ORPC. Similar language is now found in Rule 1.15(f), ORPC, effective January 1, 2008:

Where funds or other items of property entrusted to a lawyer have been impressed with a specific purpose as to their use, they shall retain that specific character unless otherwise authorized by a client or third person or pro-

hibited by law. Where funds are impressed with a specific purpose, a lawyer may not subject them to a counterclaim, set off for fees, or subject them to a lien.

9. Rule 1.1, ORPC, provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."

10. Rule 1.8(e), ORPC, provides: "A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation...."

RGDP; *State ex rel. Okla. Bar Ass'n v. Bolton*, 1994 OK 53, ¶ 15, 880 P.2d 339, 344. The Bar must present clear and convincing evidence that the accused lawyer violated the ethical rules. *State ex rel. Okla. Bar Ass'n v. Rogers*, 2006 OK 54, ¶ 9, 142 P.3d 428, 432. In conducting a de novo review of disciplinary proceedings, this Court is not bound by the parties' admissions or stipulations or by the PRT's findings of fact, its view of the evidence, its view of the credibility of witnesses, or its recommendations of discipline. *State ex rel. Okla. Bar Ass'n v. Beasley*, 2006 OK 49, ¶ 8, 142 P.3d 410, 413; *State ex rel. Okla. Bar Ass'n v. Todd*, 1992 OK 81, ¶ 2, 833 P.2d 260, 262. To discharge this responsibility, the Court must re-examine the record and assess the weight and credibility of the evidence to determine whether the attorney's misconduct is established by clear and convincing evidence.[11] Beasley, 2006 OK 49, ¶ 8, 142 P.3d at 413. If it is, we must impose the appropriate discipline. *Id.*

## DISCUSSION

### Forgery

■ ¶ 21 Ms. Jay accused Respondent of signing her name to the first settlement check without her knowledge or permission. Respondent claims he had Ms. Jay's permission to sign her name to the check because she lived some distance from his office and wanted the check deposited. Respondent argues that Ms. Jay would not have given him permission to sign her name to the final settlement check (which she admits doing) if he had previously forged her name. He also points to another instance in which Ms. Jay claimed forgery and argues that the circumstances render her assertion absurd.

¶ 22 The PRT concluded that the Bar did not establish by clear and convincing evidence that Respondent forged Ms. Jay's name, although the facts underlying Respondent's previous discipline weaken Respondent's position on this issue. We agree. The Bar has not established by clear and convincing evidence that Respondent forged Ms. Jay's name to the first settlement check.

### Commingling

■ ¶ 23 Respondent admitted he commingled trust funds in violation of Rules 1.15 and 8.4, ORPC, and Rule 1.4, RGDP. When money is entrusted to an attorney, the attorney has a fiduciary duty to apply the funds "strictly to the purpose intended." *State ex rel. Okla. Bar Ass'n v. Mayes*, 2003 OK 23, ¶ 18, 66 P.3d 398, 404. We evaluate a claim that an attorney has mishandled a client's funds using three increasing levels of culpability: (1) commingling; (2) simple conversion; and (3) misappropriation, also known as theft by conversion or otherwise. *State ex rel. Okla. Bar Ass'n v. Combs*, 2007 OK 65, ¶ 13, 175 P.3d 340, 346; *State ex rel. Okla. Bar Ass'n v. Funk*, 2005 OK 26, ¶ 63, 114 P.3d 427, 437.

■ ¶ 24 Commingling occurs when the client's money is combined with the attorney's personal funds. *State ex rel. Okla. Bar Ass'n v. Arnold*, 2003 OK 31, ¶ 21, 72 P.3d 10, 14. More serious, simple conversion "occurs when a lawyer applies a client's money to a purpose other than that for which it was entrusted to the attorney." *Id.* Misappropriation, the most serious form of mishandling a client's funds, occurs "when an attorney purposely deprives a client of money by way of deceit and fraud." *Id.* Misappropriation requires disbarment. *Id.*

■ ¶ 25 The Bar has stipulated, based on his cooperation in the investigation, that Respondent had no intent to "commingle, convert, or misappropriate funds from his client trust account." We cannot accept this stipulation. *See Beasley*, 2006 OK 49, ¶ 8, 142 P.3d at 413. Respondent's improper use of trust funds persisted for months and involved thousands of dollars. These factors compel the conclusion that Respondent intentionally used Ms. Jay's settlement funds for his own purposes while they were in his safekeeping. Mishandling a client's funds at this level cannot be described as inadvertent. Respondent's conduct rises to simple conversion at a minimum. "Although it may be difficult to discern between the three levels

---

11. The record presented by the Bar in this matter is sufficient to permit this Court's thorough inquiry. *See State ex rel. Okla. Bar Ass'n v. Wagner*, 2007 OK 3, ¶ 7, 152 P.3d 212, 214.

of misconduct, here it is clear that more is at issue than a mere commingling of client funds." *Mayes*, 2003 OK 23, ¶ 19, 66 P.3d at 404–05 (conversion occurred where records disclosed persistently low and overdrawn trust fund balance and attorney testified funds were used for living and employee expenses).

¶ 26 The PRT correctly concluded that, at best, Respondent gambled with Ms. Jay's settlement money on the assumption that he would be able to obtain additional funds to replace the trust funds he used. Despite Respondent's undergraduate degree in accounting, he would have this Court believe that this situation arose out of his complete ignorance of the proper management of a trust fund, ignorance so pervasive that he did not know that he could not simply transfer funds out of the trust account to cover business expenses. We decline to accept this explanation. The simple fact is that, as of June 2003, all of the money Ms. Jay had received from the liability insurers was gone and Respondent's trust fund had a negative balance. Only the significant check Respondent received from the UM insurer allowed Respondent to pay Ms. Jay's obligations and release Ms. Jay's share to her. If we did not deem Respondent's conduct to be simple conversion, we would call it misappropriation. There is "a distinction between irregular record-keeping and actual misuse of funds." *State ex rel. Okla. Bar Ass'n v. Dunlap*, 1994 OK 81, ¶ 21, 880 P.2d 364, 368. Respondent's actions went well beyond irregular record-keeping.

## Incompetent Representation

¶ 27 The PRT also determined that Respondent failed to competently represent his client in violation of Rule 1.1, ORPC. The fact that the Bar did not charge a violation of a particular rule of conduct is not fatal to this Court's determination that Respondent violated that rule. *State ex rel. Okla. Bar Ass'n v. Malloy*, 2006 OK 38, ¶ 12 n. 5, 142 P.3d 383, 387 n. 5. It is sufficient if the Bar has alleged facts to put an attorney on notice of the violation and has allowed him an opportunity to respond. *Id.* Because Respondent's primary defense was incompetence–complete ignorance of the fundamentals of managing a trust account–notice is

not an issue. The stipulated facts provide clear and convincing evidence that Respondent did not competently represent his client. If we found otherwise, we would be forced to conclude that Respondent's simple conversion rose to the level of misappropriation (with resulting disbarment). *See Arnold*, 2003 OK 31, ¶ 21, 72 P.3d at 14.

## Improper Loan to a Client

¶ 28 Finally, the PRT determined that Respondent also violated Rule 1.8, ORPC, by giving Ms. Jay $500 from his personal account. While we cannot approve of Respondent's bookkeeping methods, we find no impermissible loan. Respondent's payment to Ms. Jay was not "in connection with pending or contemplated litigation," as required by Rule 1.8(e), and he had settlement money in his trust account to which Ms. Jay was entitled. While Respondent should have been, and presumably will be in the future, more careful to pay funds from the proper accounts, we conclude that there was no violation of Rule 1.8.

## Discipline

¶ 29 This Court exercises its responsibility to decide whether misconduct has occurred and the appropriate discipline "not for the purpose of punishing an attorney, but to assess his or her continued fitness to practice law, and to safeguard the interests of the public, the courts and the legal profession." *State ex rel. Okla. Bar Ass'n v. Wilburn*, 2006 OK 50, ¶ 3, 142 P.3d 420, 422. However, "[d]isciplinary action is also administered to deter the attorney from similar future conduct and to act as a restraining vehicle on others who might consider committing similar acts." *Mayes*, 2003 OK 23, ¶ 25, 66 P.3d at 406 (footnote omitted). In assessing discipline, we look to other cases involving similar acts of misconduct. *Malloy*, 2006 OK 38, ¶ 12, 142 P.3d at 387. "[D]iscipline for commingling has varied from public censure to disbarment, depending generally on the degree of harm caused the client." *State ex rel. Okla. Bar Ass'n v. Briggs*, 1999 OK 76, ¶ 17, 990 P.2d 869, 873.

¶ 30 We agree with the PRT and the Bar that a one year suspension is the most appropriate punishment for Respondent's actions. Disciplinary proceedings with similar

facts have generally resulted in similar punishments. For example, where the respondent converted settlement funds by failing to pay a medical lienholder when he received a settlement check, he was suspended for one year even though he did not profit from his actions, fully cooperated in the investigation, admitted fault, and had never before been disciplined during 24 years of practice. *State ex rel. Okla. Bar Ass'n v. Parsons,* 2002 OK 72, 57 P.3d 865. Similarly, a respondent who habitually delayed the payment of his clients' medical bills and whose trust fund frequently fell below the required balance, received an 18-month suspension despite more than 30 years of practice. *State ex rel. Okla. Bar Ass'n v. Stormont,* 2001 OK 80, 37 P.3d 795; *see also State ex rel. Okla. Bar Ass'n v. Brown,* 1998 OK 123, 990 P.2d 840 (falsely endorsing government official's name on check, unintentionally delaying payment of government's medical lien; previous discipline for falsely endorsing another's name on a check, failing to notify client of receipt of funds, and misleading client; mitigated by candor to tribunal-suspended two years and one day); *State ex rel. Okla. Bar Ass'n v. Meek,* 1994 OK 118, 895 P.2d 692 (commingling with misleading statements, but no grave economic harm to client and no previous discipline-suspended one year).

¶ 31 Respondent asks this Court to show leniency by placing him on probation rather than suspending him and cites *State ex rel. Oklahoma Bar Association v. Briggs,* 1999 OK 76, 990 P.2d 869, to support his argument. In *Briggs,* however, there had been little or no direct wrongdoing by an attorney who sold a client's stocks, with her permission, as payment for legal fees, forgetting that the client's ex-husband had been awarded an interest in the stocks in their divorce. The attorney acknowledged the mistake as soon as he realized it and reimbursed the ex-husband, including the attorney fees the ex-husband incurred as a result, resulting in a considerable financial loss to the attorney. The attorney was disciplined with public censure only because of his delay in responding to the Bar's investigation, not because of any commingling or conversion.

¶ 32 We cannot accede to Respondent's plea for lenience. While we accept Respondent's assertion that he is deeply remorseful and has made significant changes to avoid similar misconduct, one purpose of disciplinary action is to deter similar unethical conduct in the future. *Mayes,* 2003 OK 23, ¶¶ 25–26, 66 P.3d at 406–408. Respondent has already received a milder punishment for actions taken during this same time period. Although the proximity of the underlying events would normally mean that the previous discipline would have little effect here, Respondent's current understanding of the previous discipline demonstrates that it may not have served its purpose. Respondent testified that "the Schnackel situation is the only time I've ever signed a client's name without permission *and it's my belief that I did that in their best interest."* (Emphasis added.) It appears, unfortunately, that the private reprimand may not have sufficiently informed Respondent's current understanding of appropriate conduct for a member of the Oklahoma Bar Association. Probation, therefore, would not "safeguard the interests of the public, the courts and the legal profession," deter Respondent from "similar future conduct," or "act as a restraining vehicle on others who might consider committing similar acts." *Wilburn,* 2006 OK 50, ¶ 3, 142 P.3d at 422; *Mayes,* 2003 OK 23, ¶ 25, 66 P.3d at 406 (footnote omitted). A one year suspension should serve those purposes and impress upon Respondent the need to conduct his professional activities more judiciously in the future.[12]

**RESPONDENT SUSPENDED
FOR ONE YEAR.**

CONCUR: WINCHESTER, C.J.; HARGRAVE, OPALA, KAUGER, WATT, TAYLOR, COLBERT, REIF, JJ.

NOT PARTICIPATING: EDMONDSON, V.C.J.

---

12. Respondent has already paid costs of $909.91 as requested by the Bar and ordered by the PRT.

Rule 6.16, RGDP.