OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MILLER

 

 
 

 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MILLER
2020 OK 4
Case Number: SCBD-6687
Decided: 01/14/2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 4, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

STATE OF OKLAHOMA ex rel., OKLAHOMA BAR ASSOCIATION, Complainant,
v.
LAURIE JEAN MILLER, Respondent.
ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE
Â¶0 The Complainant, Oklahoma Bar Association, charged the Respondent, Laurie Jean Miller, with three counts of professional misconduct that included failure to competently represent her clients, failure to be diligent in her representation of her clients and failure to communicate effectively with her clients. In addition, the Complainant charged the Respondent with mishandling of client funds, violating rules of professional conduct and the commission of an act contrary to prescribed standards of conduct. Having found clear and convincing evidence to support all three counts, the Trial Panel recommended the Respondent be suspended for eighteen months. We hold there is clear and convincing evidence that the totality of the Respondent's conduct warrants disbarment. The Respondent is ordered to pay the costs as herein provided within ninety days after this opinion becomes final.
RESPONDENT DISBARRED.
COSTS CHARGED TO RESPONDENT.
Peter Haddock, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.
Travis A. Pickens, Edinger, Leonard & Blakley, PLLC, Oklahoma City, Oklahoma for Respondent.
COMBS, J.:
Â¶1 The Complainant, State of Oklahoma ex rel. Oklahoma Bar Association (Complainant), began proceedings pursuant to Rule 6, Rules Governing Disciplinary Proceedings (RGDP) 5 O.S. 2011, ch. 1, app. 1-A alleging three counts of professional misconduct against the Respondent, Laurie Jean Miller (Respondent). The Respondent is an active member of the Oklahoma Bar Association and is currently in good standing with the Association. For most of her career she has been a sole practitioner but has also shared offices with other attorneys. She left private practice in 2017 and took a position with an insurance company where she is currently employed.
[1] The Complainant's allegations arise from the Respondents conduct towards several of her clients she had while in private practice. The matters involved are related to three separate governmental tort claims actions. The Complainant alleges the Respondent's actions are in violation of the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S. 2011, ch. 1, app. 3-A, and the RGDP and are cause for professional discipline.
I. Procedural History
Â¶2 Two of the Respondent's former clients filed grievances against her with the Complainant. Claudia Murcia filed her grievance on December 23, 2016 (Murcia grievance). Brian Sanders filed his grievance on November 16, 2017 (Sanders grievance). After receiving responses from the Respondent in both grievances, the Complainant opened a formal investigation into each one. The Complainant met with the Respondent several times to discuss the grievances. Thereafter, it filed its formal Complaint against the Respondent on September 17, 2018. The Respondent initially represented herself and entered an appearance and filed her Answer. Thereafter she hired an attorney to represent her. During the course of investigating the Sanders grievance the Complainant discovered information concerning another similar case. The Complainant then opened a grievance against the Respondent in this new matter concerning Respondent's former clients Cornel and Sharon Solis (Solis grievance). It also filed a Supplemental Complaint on December 21, 2018, containing these new allegations of misconduct. Respondent's attorney answered the Supplemental Complaint. 
Â¶3 The Professional Responsibility Tribunal (PRT) held a hearing concerning these grievances pursuant to Rule 6, RGDP which occurred on two separate days; March 14, 2019 and March 25, 2019. In closing argument, the Complainant recommended the Respondent be suspended from the practice of law for one year. On June 13, 2019, the Trial Panel filed its report wherein it found the allegations of the Complaint and Supplemental Complaint had been established by clear and convincing evidence. Even after considering all the mitigating factors the Trial Panel unanimously recommended a longer suspension of eighteen months. This matter was assigned to this office on August 19, 2019.
II. Standard of Review
Â¶4 In Bar disciplinary proceedings, this Court possesses exclusive original jurisdiction. State ex rel. Oklahoma Bar Ass'n v. Holden, 1995 OK 25, Â¶ 10, 895 P.2d 707. Our review of the evidence is de novo in determining if the Bar proved its allegations of misconduct by clear and convincing evidence. Rule 6.12(c), RGDP; State ex rel. Oklahoma Bar Ass'n v. Bolusky, 2001 OK 26, Â¶ 7, 23 P.3d 268. Clear and convincing evidence is that measure or degree of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. State ex rel. Oklahoma Bar Ass'n v. Green, 1997 OK 39, Â¶5, 936 P.2d 947. Our goals in disciplinary proceedings are to protect the interests of the public and to preserve the integrity of the courts and the legal profession, not to punish the offending lawyers. State ex rel. Oklahoma Bar Ass'n v. Kinsey, 2009 OK 31, Â¶15, 212 P.3d 1186. Discipline is administered to preserve the public confidence in the bar and to deter an attorney from similar future misconduct. State ex rel. Oklahoma Bar Ass'n v. Phillips, 2002 OK 86, Â¶21, 60 P.3d 1030. Whether to impose discipline is a decision that rests solely with this Court and the recommendations of the PRT are neither binding nor persuasive. State ex rel. Oklahoma Bar Ass'n v. Eakin, 1995 OK 106, Â¶ 8, 914 P.2d 644.
III. The Grievances
A. Count I. The Murcia Grievance
Â¶5 The first grievance was filed by Claudia Murcia (Murcia). Murcia is from El Salvador, and English is not her first language. The record reflects she uses a translator when communicating at all relevant times related to her grievance. In 2009, Murcia worked at a hotel in Norman, Oklahoma. In February of that year she was injured while riding a public bus to work. Her injuries required medical treatment and she incurred several medical bills. Murcia had health insurance at the time but chose not to file these tort-related claims with her insurance. She hired Michael Sherrod (Sherrod) to represent her in this personal injury matter. Sherrod filed a petition on February 11, 2011 against the State of Oklahoma ex rel. University of Oklahoma, Cleveland Area Rapid Transit, and the bus driver.
[2] Since this tort claim involved a governmental entity the Oklahoma Governmental Tort Claims Act (OGTCA) applied. Sherrod, however, filed the petition within two years from the date of the accident rather than under the provisions of the OGTCA.[3] Sherrod testified he realized he had missed the statute of limitations when the opposing side filed a motion to dismiss and thereafter he immediately informed Murcia he had missed the statute of limitations.[4] Murcia hired the Respondent in January 2012 hoping she could proceed with her case. Murcia testified that Sherrod had informed her that the statute of limitations had run prior to hiring the Respondent and that she informed the Respondent of this at their first meeting.[5] The Respondent testified Murcia had not informed her that the statute of limitations had run but told her only that her attorney could not prosecute her case any longer and was ill.[6] The Respondent testified she would not have taken Murcia's case had she known the statute of limitations had run.[7] 
Â¶6 The Respondent reviewed the petition online and determined nothing on its face seemed out of order, so she proceeded with the representation. She first filed an application for leave to make service out of time which was quickly challenged by a motion to vacate. Not long afterwards, the opposing counsel filed a motion to dismiss. The opposing counsel also sent the Respondent a letter with an attached proposed motion for sanctions which she would file if the Respondent did not dismiss the action.[8] On September 10, 2012, the Respondent dismissed the action by filing a dismissal without prejudice.[9] 
Â¶7 Following the dismissal, the Respondent helped negotiate a settlement between Murcia and Sherrod for any malpractice Sherrod may have made in her case. The goal was to see if Sherrod could compensate Murcia for his failure to timely file her petition, and any money received from him could be used to pay Murcia's medical bills. The Respondent agreed to help Murcia with these matters. Her contract with Murcia only concerned the tort action.[10] There is no evidence of a subsequent contract after the tort action was dismissed. In her January 17, 2017 response to the grievance, the Respondent wrote "at this point [after the case was dismissed], I realized this case is going to be done pro-bono and was in fact an attempt to help a colleague to keep from obtaining a bar complaint and a lawsuit against him."[11] She later testified that even though she realized there would be no recovery, she did not tell Murcia she would represent her pro-bono on these additional matters.[12] 
Â¶8 On or about July 25, 2014, Sherrod settled with Murcia by providing her a quit claim deed thereby transferring land he owned in Pittsburgh County, Oklahoma.[13] Murcia authorized the Respondent to sell the land on her behalf and to apply the proceeds to her outstanding medical bills.[14] Sherrod gave the Respondent's name to a potential purchaser, Mr. Stuart, who was interested in buying Sherrod's land.[15] Mr. Stuart contacted the Respondent and they negotiated a sale of the land.[16] Murcia agreed and the property was sold on March 29, 2015 for $4,600.00 in cash.[17] On the same day, Murcia signed and presented a release of all claims to Sherrod which was prepared by the Respondent.[18] Murcia's total medical bills were $12,084.95 which exceeded the amount of the proceeds from the sale. The Respondent agreed to negotiate with the providers/collection agencies to reduce the bills.[19] The largest bill was to Therapy in Motion in the amount of $5,691.50 for physical therapy.[20] TekCollect, a collection agency, was authorized to collect this bill in December 2014 and began contacting Murcia around that time.[21] Other providers had been pursuing collection efforts as well.[22] These efforts, including Therapy in Motion's efforts to collect Murcia's debt, had begun prior to the sale of the land.[23] 
Â¶9 After the March 29, 2015 sale took place, the Respondent took the $4,600.00 cash proceeds and placed them in a safe at her law office.[24] Murcia did not ask for the money because she wanted the Respondent to negotiate and reduce her bills to the amount of the sale proceeds and use that money to pay those bills.[25] This was their agreement and she trusted the Respondent to do this.[26] The Respondent had an Interest on Lawyers Trust Account (IOLTA) at the time she placed the money in her safe.[27] She testified she was confused as to what to do with cash.[28] She was not accustomed to getting cash, and she thought she would be safekeeping the money by just placing it in her safe.[29] 
Â¶10 Murcia continued receiving calls from collection agencies regarding these medical bills.[30] In 2016, for approximately five months she tried to get proof from the Respondent that her bills had been paid.[31] Murcia's grievance alleged that the Respondent kept "putting off sending me them [proof of payment of her medical bills]."[32] The record reflects that in December 2016 Murcia and the Respondent corresponded over several days via a series of text messages.[33] An excerpt of those messages is as follows:

Date unknown presumably early December 2016
: 
Murcia
: Ms. Laurie sorry for bothering you it's just that I'm worried about my case. It has been more than 2 months since you told me the case was closed and I still haven't received any proof that the case was truly closed. Or is there something happening I don't know of in the case?
Respondent
: It's over I just have been swamped!
Murcia
: When will I receive the papers for sure? Or will I pick them up at your office?
Respondent
: Next Monday.
Murcia
: Okay I will be expecting them next Monday thank you. Sorry for bothering you.
Monday, December 12, 2:38 PM
.
Murcia: Ms. Laurie please don't forget you were going to send me the papers today by email
Respondent: All I have is the check that says paid in full-it's at my accountants office- she is going to send me a copy of it.
Monday, December 12, 4:25 PM.
Murcia: When will you send it to me?
Respondent: Yes as soon as I get it from her.
Murcia: Okay what is left to finish this case? I want to be done with all of this.
Respondent: It's done. The last bill to be paid was the PT bill and we settle for what was paid on the land-can't even remember the amount now.
Murcia: I just want proof that everything is paid for....
Friday, December 16, 8:41 AM and repeated again at 2:14 PM.
Murcia: Good morning. I am frustrated that I can't get concrete answers or proof of how my case is going and that is something I should be kept up to date in. If by Tuesday I haven't received anything from you I will go the OBA's.
Monday, December 19, 10:03 AM.
Murcia: Are you going to send the proofs today yes or no?
Respondent: Yes. I haven't been in the office since Thursday.
Murcia: Okay send it to me by email please.
Respondent: Ok- I will be in this afternoon.
Murcia: Ok thank you.
Monday, December 19, 4:05 PM.
Murcia: Please Ms Laurie don't forget the copies before you leave your office.
Respondent: It's a check to TekCollect on 7-22-16- we are trying to find a copy of the check- the accountant has all my stuff. It was the amount of the check for the sale of the land-Still looking.
Murcia: Send it to me asap please.
Â¶11 In Murcia's May 2017 reply letter, she attaches additional text messages between her and the Respondent.
[34] In those text messages Murcia asks about the other medical bills besides the one to Therapy in Motion. The Respondent unequivocally states "we already paid those." In another text message Murcia asks for "proof that all the places are paid and that the case is closed." The Respondent replied "[o]k ...I don't have any releases but I can give you copies of checks...I put paid in full on checks. Sorry I haven't sent them. I was crazy swamped before I left. I will email the checks to you." No checks were ever emailed to Murcia. The Respondent later testified she had never seen a check that said "paid in full."[35] These texts also include the Respondent telling Murcia she had filed a lawsuit against Therapy in Motion. The lawsuit was premised upon new case law that held a provider was prohibited from choosing not to file an insurance claim. No lawsuit was ever filed.
Â¶12 Murcia is desperately trying to receive proof that after over a year since the Respondent received the $4,600.00 her medical bills have been negotiated and paid. These text messages clearly show the Respondent is telling her that not only has the PT bill been paid, which is the bill from Therapy in Motion and being collected by TekCollect, but it was the last one and "[i]t's done." She is clearly indicating to her client that all her medical bills have been paid. She even tells Murcia on a specific date, July 22, 2016, she paid the amount owed to TekCollect by check. The Respondent's later excuse for not sending her a copy of the check is that it is with her accountant. This is so even though she had previously indicated to Murcia that she had multiple checks and was going to email them to her. On December 23, 2016, without receiving any proof that her bills had been paid, Murcia filed a grievance with the Complainant.
[36] 
Â¶13 On January 17, 2017, the Respondent replied to the grievance.[37] In approximately one month from the date of these last text messages, the Respondent's story has changed from what she told Murcia. She tells the Complainant that she had to pay the Therapy in Motion bill with a credit card on her operating account and therefore she did not have a receipt. This assertion contradicts her story to Murcia that she paid it with a check on July 22, 2016. She further claims her bank account had been purged due to identity theft, and she could not get a copy of her bank statement. In addition and without providing any context, she mentions that a lien placed on Murcia's case by Therapy in Motion had been released. Her letter concludes that Murcia "never advised me she was going to file a bar complaint." However, Murcia clearly warned her in the text messages that she would file a grievance if she did not receive the information she needed; "I will go to OBA's."

Â¶14 On February 2, 2017, Debbie Maddox (Maddox), the OBA Assistant General Counsel, emailed the Respondent requesting a copy of the credit card receipt or statement showing the payment to Therapy in Motion. This was not provided so Maddox sent the Respondent a follow-up letter on March 31, 2017 warning her if she did not provide this information within five days she would upgrade this matter to a full disciplinary investigation.
[38] In her response, the Respondent states the credit card payment was made in September 2015 and her account was closed due to identity theft during that period.[39] Additionally, she claims to have contacted Therapy in Motion but they had no record of the payment, and she claims TekCollect did not report the payment to Therapy in Motion. She also claims on numerous occasions she told Murcia there was not enough money from the sale to pay all the bills. She blames a language barrier as the reason for Murcia's misunderstanding and claims she tried to have an interpreter with her when they met but that was not always possible. This point was strongly contested by Murcia. Murcia had always brought either her daughter or her husband to any meeting she had with the Respondent, and they understand and speak English.[40] Her letter also curiously states that when the property was sold to Mr. Stuart he paid with a "money order" which was clearly not the case; it was paid in cash and the Respondent had actually signed the receipt and marked it as paid in cash.[41] Ex. 25.
Â¶15 On April 14, 2017, Maddox opened this matter for formal investigation.
[42] In her May 3, 2017 response, the Respondent provided more detailed information.[43] She claims the sale of the property to Mr. Stuart occurred in September 2015, the same time frame she is claiming she paid Therapy in Motion with a credit card. However, all the evidence in the record, the receipt from the sale, the deeds conveyed, clearly indicate the sale occurred on March 29, 2015.[44] She explains that in 2016 she threatened suit against Therapy in Motion based upon new case law but later realized it was not applicable to Murcia so the lawsuit was not filed. Afterwards, she claims Murcia only wanted "some of her bills paid." The Respondent focused on Therapy in Motion because it was the only provider that had a lien on file. She alleged Therapy in Motion agreed to take $4,600.00 and the Respondent was required to pay this amount with a credit card; she did not have a credit card on her trust account so she deposited the money into her operating account and paid with the operating account's credit card. Following her statement about making this payment she writes "[t]he lien on her case was released." However, the lien she is referring to had nothing to do with any payment made on Murcia's behalf.[45] The lien filed by Therapy in Motion was originally made August 2, 2010.[46] It was later amended on December 12, 2011 and named the Department of Central Services as an insurance company.[47] On December 4, 2012, the lien was released and stated "payment was received by the undersigned [Therapy in Motion]." This lien release occurred over two years before the sale of the property (March 29, 2015). Therefore, it would be impossible for the Respondent to understand that the sale proceeds were somehow responsible for Therapy in Motion releasing its lien. But that is clearly her implication in her response to the Complainant.[48] At the PRT hearing a former employee of Therapy in Motion testified that the lien release was made due to the State informing them that no lien could be placed upon the State.[49] The reason the lien release said payment had been received was due to the use of a standard form and that statement was in error.[50] Representatives from both Therapy in Motion and TekCollect testified that no payments of any kind had ever been received on behalf of Murcia.[51] The representative from TekCollect acknowledged the Respondent's efforts to reduce Murcia's bill, but TekCollect informed her it would not take less than eighty percent of the amount owed.[52] Still no payment was ever made.[53] 
Â¶16 The Respondent further explained to the Complainant that her identity was stolen during August through October of 2015, the period she claims she paid TekCollect with a credit card.[54] She claims her account was closed and was purged from her bank's system. She also claims she advised Murcia of this and then attempted to contact her accountant but found out her accountant had died and there was no way to get these records. When she contacted Therapy in Motion they no longer had Murcia's file in their system. She again claims she informed Murcia numerous times there was not enough money to pay all of her bills and blames the language barrier for Murcia's misunderstanding. She then tells the Complainant that Murcia has not paid any of the attorney fees and costs they agreed to in the contract. However, her contract with Murcia was a contingency fee contract which states "[i]n the event of failure of recovery, the Attorney shall claim no compensation from Client."[55] It is clear the Respondent dismissed the original lawsuit due to the statute of limitations having already run. The record provides no evidence of any new contract being made after the lawsuit was dismissed.

Â¶17 The Respondent's brief states she voluntarily provided her bank records to the Complainant.
[56] However, the Complainant was forced to issue a subpoena duces tecum on February 5, 2018 when they did not receive requested bank account records.[57] The subpoena covered all bank accounts of the Respondent including her IOLTA and operating account as well as personal accounts.[58] The records from the bank covered the period from January 1, 2014 to February 5, 2018.[59] The bank also wrote the OBA investigator explaining the Respondent's law firm business account was "charged off" from March 20, 2015 to March 14, 2016 and is currently active after that period.[60] The letter states the term "charged off" means the account was overdrawn for more than thirty days and was automatically closed. During this period, no activity could occur on that account. However, the Respondent told the Complainant she paid the Therapy in Motion bill with a credit card in September 2015 which was during this period.[61] The letter from the bank to the OBA investigator does not specify if identity theft was involved. Regardless of whichever account she could have paid from, the OBA investigator testified none of her accounts showed a deposit of $4,600.00 or any payments made to cover Murcia's bills.[62] 
Â¶18 At the PRT hearing, the Respondent was questioned about her different explanations as to how Murcia's bills were paid. In one instance she told Murcia she paid by a check on a certain date but then told the Complainant she paid with a credit card on a different date. Her response was that those statements might be interpreted as inconsistencies but they were not anything that would require "that that is not the truth."[63] The assistant general counsel then asked her, "one of these statements, or both, are false, are they not" to which she replied "[t]hey were not false at the time I made them."[64] When asked about her communications to Murcia concerning the supposed July 22, 2016 check payment she responded "I was truthful in what I told her at the time I made the message."[65] The Respondent acknowledged there was no check or credit card payment.[66] Her testimony also reflected she was hoping the OBA could find evidence of a payment in one of her bank records.[67] 
Â¶19 The Trial Panel members also questioned the Respondent about the $4,600.00 she put into her safe and why she did not just pay Murcia when she first met with the OBA. The Respondent testified, "[w]ell, obviously, I mean, there--there was no money in the safe. I mean I don't know what happened to the money during this period. I just don't know."[68] She could not even remember when she first discovered the money was missing.[69] She also testified she did not inform Murcia that the money was no longer in her safe.[70] The record does not reflect she reported the missing money as stolen.

B. Counts II and III. The Sanders and Solis Grievances
Â¶20 The Respondent was hired to represent the Sanders and Solis families in their actions against the Shawnee Public Schools. The OGTCA was applicable to each case. In both cases Shawnee Public Schools did not respond to the tort claim letters. The petitions were filed on May 3, 2016. However, due to a leap year miscalculation, they were filed one day late.
[71] The Respondent testified she had worked on these cases with another attorney, Steven Crow (Crow).[72] In her response to the Complainant she stated Crow was the lead counsel, however, she admitted at the hearing neither attorney was considered the lead counsel and she was equally responsible for whatever happened in those cases.[73] She and Crow shared responsibilities when working on education cases, and both met with the Sanders and Solis families together on the same day.[74] Crow testified that he believed he was the one who miscalculated the date to file the petitions.[75] However, the petitions were both prepared and signed by the Respondent and she was the one who had them filed.[76] 
Â¶21 On July 3, 2017, Shawnee Public Schools filed a motion to dismiss in each case.[77] The grounds for dismissal were clearly specified in the motions and were based on the petitions being filed outside of the statute of limitations. On July 20, 2017, the Respondent signed and filed a dismissal without prejudice in each case.[78] She testified she did not learn the motions were based on a failure to meet the statute of limitations until the bar grievance was filed.[79] She claims she did not read the motions at the time she filed her dismissals; "I don't know what I was doing at the time, but I was too busy to stop and read the pleading."[80] The Respondent's explanation was she and Crow received motions to dismiss in about ninety percent of these education cases and Crow would be the one to review the pleadings then inform her of what to do, e.g., file a dismissal without prejudice because they needed more time to get additional information.[81] She testified that Crow told her to file a dismissal, and she did not question it or ask why.[82] Crow testified he believes he ultimately made the decision to file the dismissals without prejudice.[83] 
Â¶22 After the dismissals were filed, neither attorney notified the Sanders or the Solis families of the dismissal. On September 21, 2017, the Respondent sent Mr. Sanders a letter informing him that she is closing her legal practice and "I leave your case in good hands."[84] The letter does not mention she had filed a dismissal without prejudice in his case. The letter also indicates that she was transferring his file to Crow. The record does not include a similar letter to the Solis family. Both clients testified that the Respondent never notified them of the dismissal of their cases.[85] The Respondent testified that if she had thought the dismissals had ended their cases permanently she would have notified them.[86] She and Crow were also looking at other possible theories of recovery under federal constitutional claims therefore she did not think it was important to provide information of the dismissal.[87] However, she admits that a failure to meet the statute of limitations would have been a critical error to the OGTCA claims.[88] She now believes that she should have notified her clients of the dismissals.[89] Mr. Sanders testified that a few months after he received the letter he decided to retain another attorney rather than proceed with Crow.[90] The new attorney is the one who informed him that his case had been dismissed for failing to meet the statute of limitations.[91] The first time the Solis family heard their case had been dismissed was when they were contacted by the OBA investigator.[92] 
IV. The Rule Violations

Â¶23 The Trial Panel filed its report on June 13, 2019. The report found the Complainant had proven by clear and convincing evidence the Respondent violated Rules 1.3 (Diligence)[93], 1.4 (Communication)[94], 1.15 (Safekeeping Property)[95], 8.4(a) and (c) (Violating Rules of Professional Conduct/Engaging in Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation)[96] ORPC and Rule 1.3 (Discipline for Acts Contrary to Prescribed Standards of Conduct)[97] RGDP in the Murcia case. It also found the Respondent violated Rules 1.1 (Competence)[98], 1.3 (Diligence), 1.4 (Communication), and 8.4(a) (Violating Rules of Professional Conduct) ORPC as well as Rule 1.3 (Discipline for Acts Contrary to Prescribed Standards of Conduct) RGDP in both the Sanders and Solis cases.
Â¶24 In the Murcia case the Respondent argues she did everything she could for Murcia and she communicated with her at all hours of the day without any restrictions. However, it cannot be said she acted diligently on behalf of her client. The Respondent testified she had even closed Murcia's file at one point as if the case was concluded when there were outstanding medical bills left to be paid.[99] For years the bills were left unpaid and Murcia's credit report reflected this fact.[100] She kept stringing Murcia along and never gave her the information she requested. Her communications with Murcia may have been frequent but they were full of misrepresentations.
Â¶25 For conduct to constitute a Rule 8.4 (c) ORPC violation the misrepresentation must be shown by clear and convincing evidence that the declarant had an underlying motive, i.e., bad or evil intent, for making the statement. State ex rel. Oklahoma Bar Assn' v. Johnston, 1993 OK 91, Â¶16, 863 P.2d 1136. An intent element is required and the OBA must adequately show the attorney had a purpose to deceive. State ex rel. Oklahoma Bar Ass'n v. Besly, 2006 OK 18, Â¶43, 136 P.3d 590. Here, the evidence shows a clear purpose as to why the Respondent misrepresented she had paid the providers. The $4,600.00 sale proceeds were no longer in her safe, it just disappeared. She never communicated this fact to Murcia. We find clear and convincing evidence that she not only intentionally deceived her client about the bills being paid but she intended to deceive the Complainant as well by repeatedly telling them at least one provider had been fully paid. The evidence shows no provider had ever been paid and the sale proceeds were never deposited into any bank account. Her motive for the deception is that the money was no longer in the safe. She could not account for what happened to it nor could she even recall when she discovered it was no longer there. Nor did she claim it was stolen.
Â¶26 It is clear that the Respondent did not safeguard this money properly when she placed it into her safe rather than in her IOLTA account. Rule 1.15 (a) ORPC treats funds separately from other property. It provides that "funds shall be kept in a separate account....Other property shall be identified as such and appropriately safeguarded." Comment 1 to the rule provides "[a]ll property that is the property of clients ... must be kept separate from the lawyer's business and personal property and, if monies, in one or more trust accounts." The money from the sale of the property was not deposited into any bank account let alone a client trust account.
Â¶27 The Complainant asserts in its brief that the Respondent's actions constitute misappropriation of Murcia's funds. Although the Trial Panel did not make a specific finding of misappropriation, this Court is not bound by the trial authority's findings or its assessments as to weight or credibility of the evidence. State, ex rel. Oklahoma Bar Ass'n v. Raskin, 1982 OK 39, Â¶11, 642 P.2d 262. This Court has explained many times the three levels of culpability regarding the mishandling of client funds. The three levels are commingling, simple conversion, and misappropriation. State ex rel. Oklahoma Bar Ass'n v. Combs, 2007 OK 65, Â¶13, 175 P.3d 340. Misappropriation is the most serious offense of the three. It is not merely simple conversion, i.e., the use of a client's funds for a purpose other than that for which they are intended, but additionally involves an element of deceit and fraud. Id., Â¶Â¶15-16. It occurs when a lawyer purposefully deprives a client of money through deceit and fraud. Id., Â¶16. In State ex rel. Oklahoma Bar Ass'n v. Mayes, we held an attorney who represented to the Court that he was holding monies intended for two minor children when those funds had actually been spent on him and his secretary constituted misappropriation. 2003 OK 23, Â¶Â¶19-22, 66 P.3d 398. It was clear he committed simple conversion but his own actions of deceit propelled this Court to find he committed misappropriation. Id., Â¶22. This was so even though the Complainant did not allege misappropriation nor was there any evidence presented that the client suffered economic harm. Id., Â¶Â¶20-21.
Â¶28 The $4,600.00 proceeds from the sale of the property were not used for their intended purpose, i.e., to pay Murcia's medical bills. This fact alone constitutes simple conversion. However, the Respondent repeatedly explained to her client and to the Complainant that the money had been used to pay Murcia's medical bills, which was completely false. This was not mere carelessness or forgetfulness as the Respondent would like us to believe. These false statements happened over a period of time in which she could have corrected any errors in her statements. The disappearance of the sale proceeds combined with the Respondents many misrepresentations provide clear and convincing evidence that she purposefully deprived her client of money through deceit and fraud. We find her actions constitute misappropriation.
Â¶29 We hold the Complainant has proven by clear and convincing evidence the Respondent violated Rules 1.3, 1.4, 1.15, 8.4 (a) and (c), ORPC and Rule 1.3, RGDP.
Â¶30 Rule 1.1, ORPC, requires a lawyer to "provide competent representation to a client." In both the Sanders and Solis grievances, the Respondent failed to file their lawsuits timely under the OGTCA. This was due to a leap year miscalculation, and she did not check the filing date calculated by Crow prior to filing the petitions. When her office received the motions to dismiss in each case she did not read them to determine the grounds for the motions. She instead just filed a dismissal without prejudice in both cases. She never informed her clients of the motions to dismiss nor of the dismissals without prejudice. Her clients had to find out from other attorneys that their cases were dismissed. She claims she would have told her clients of the dismissals had she known the petitions were actually filed out of time. If she had read the motions to dismiss she would have realized this, however, she testified she was too busy to do that. Her actions show a lack of diligence and failure to communicate with her clients. She did not provide competent representation in either matter.
Â¶31 We hold the Complainant has proven by clear and convincing evidence the Respondent violated Rules 1.1, 1.3, 1.4, 8.4 (a), ORPC and Rule 1.3, RGDP.
V. DISCIPLINE
Â¶32 Discipline is imposed to preserve public confidence in the Bar. State ex rel. Oklahoma Bar Ass'n v. Phillips, 2002 OK 86, Â¶21, 60 P.3d 1030. In all three cases the Respondent's clients testified to having a negative experience with the legal profession due to the Respondent's conduct.[101] Our goal is not to punish but to gauge an attorney's continued fitness to practice law in order to safeguard the interest of the public, the courts and the legal profession. Id. This Court also administers discipline to deter an attorney from similar future conduct and to act as a restraining vehicle on others who might consider committing similar acts. State ex rel. Oklahoma Bar Ass'n v. Townsend, 2012 OK 44, Â¶31, 277 P.3d 1269. Discipline is fashioned to coincide with the discipline imposed upon other attorneys for like acts of professional misconduct. Id. This Court strives to be evenhanded and fair in disciplinary matters, yet discipline must be decided on a case-by-case basis taking into account the unique transgressions and mitigating factors. State ex rel. Oklahoma Bar Ass'n v. Mayes, 2003 OK 23, Â¶25, 66 P.3d 398.
Â¶33 In State ex. rel. Oklahoma Bar Ass'n v. Ferguson, an attorney was suspended from the practice of law for ninety days for conduct that amounted to simple conversion of client funds. 1960 OK 229, 356 P.2d 734. The Bar had recommended a six month suspension, but the Court weighed Ferguson's actions. Ferguson testified he believed the $650.00 was spent by him, but due to his emotional state and inebriation during that period he was not sure how it was spent. Id., Â¶3, Â¶8. Following a judgment against his client he made restitution by paying the $650.00 and court costs. Id., Â¶7. The opinion made no findings of dishonesty and noted his cooperation in answering questions many of which he could have refused to answer. Id., Â¶Â¶ 9, 26. In addition, this Court found he had no previous record or even "hint or breath of trouble or scandal against his name." Id., Â¶23.
Â¶34 In State ex rel. Oklahoma Bar Ass'n v. Hensley, this Court suspended an attorney for a period of two years for commingling client funds. 1977 OK 23, Â¶12, 560 P.2d 567. Following judgment in a wrongful death case, Hensley deposited a draft from an insurance carrier into his trust account, but he used this account for personal and office expenses as well. Id., Â¶3. Hensley began withdrawing these funds from his account for personal and office use while lying to his clients that the draft would not be honored because the insurance company was filing an appeal. Id., 4. He did eventually pay his clients the proceeds they were owed. Id., 5. The Court noted Hensley was only being charged with commingling of funds under the 1971 disciplinary rules. Id., Â¶Â¶7-8. There was no discussion about misappropriation even though Hensley clearly lied to his clients in order to delay payment to them. The Court determined it would not follow the trial authority's recommendation to disbar him but instead chose to suspended him for two years. Id., Â¶12. The decision was strongly influenced by the fact Hensley, after a twenty-five year practice, had never been disciplined. Id., Â¶8.
Â¶35 A finding that an attorney misappropriated funds, however, mandates the imposition of harsh discipline regardless of exceptional mitigating factors. State ex. rel. Oklahoma Bar Ass'n v. Mansfield, 2015 OK 22, Â¶18, 350 P.3d 108. In Mayes, this Court imposed disbarment as discipline. 2003 OK 23, Â¶32. In addition to the fact that the attorney was found to have misappropriated his client's funds, we emphasized his failure to cooperate with the grievance process. Id. We noted the attorney attached misleading documents to his reply to the grievance. Id., Â¶22. The Complainant was also forced to subpoena his bank records after he failed to provide the requested documents. Id.
Â¶36 This Court has held disbarment was warranted in other cases involving misappropriation. State ex rel. Oklahoma Bar Ass'n v. Doris, 1999 OK 94, Â¶Â¶40-43, 991 P.2d 1015 (Disbarring an attorney after finding he committed misappropriation of client funds by repeatedly telling his client he would pay the client but never did); State ex rel. Oklahoma Bar Ass'n v. Gray, 1997 OK 140, Â¶Â¶30-33, 948 P.2d 1221 (Disbarring an attorney for misappropriating funds of his law firm for his own personal use even though he had an otherwise unblemished career and had suffered family and financial problems).
Â¶37 The offending conduct in Mayes is similar to that in the present matter. The Respondent repeatedly lied to the Complainant as well as her client concerning the payment of certain medical bills. She made further misrepresentations to the Complainant by referring to the lien release and attaching a copy of the same in her response to the grievance.[102] The record clearly shows this lien release could not possibly have been based on any payment made by the Respondent. These misrepresentations combined with the fact that the Complainant was forced to subpoena the Respondent's bank records show a failure to cooperate in the grievance process.
Â¶38 In addition to the Respondent's misappropriation of her client's funds, her other misconduct has been found to warrant discipline. In State ex rel. Oklahoma Bar Ass'n v. Whitebook, an attorney who failed to provide competent representation, failed to act with diligence, failed to keep clients reasonably informed, failed to comply with reasonable requests for information, and failed to charge a client a reasonable fee warranted a suspension of two years and one day. 2010 OK 72, Â¶17, 242 P.3d 517. In State ex rel. Oklahoma Bar Ass'n v. Beasley, an attorney who failed to act with diligence, failed to communicate with clients, failed to refund unearned fees, and failed to provide information to the Bar was suspended for two years and one day. 2006 OK 49, Â¶44, 142 P.3d 410.
Â¶39 The Respondent has offered evidence to mitigate her discipline. She ultimately paid the $4,600.00 to Murcia after the grievance was filed. She was the primary care giver to her ailing father prior to his death during the time she represented Murcia, Sanders and Solis. Her father-in-law also died sometime during this period. She testified to having physical and emotional problems during this period which included back surgery, anxiety and depression. The Trial Panel reviewed these mitigating factors but believed the one year suspension recommended by the Complainant was not enough. It recommended she be suspended for eighteen months.
Â¶40 We agree with the Trial Panel that the Complainant's recommendation does not provide adequate discipline. However, we disagree with its recommendation. Even considering the Respondent's mitigation evidence as well as the fact that the record is devoid of any previous discipline, the totality of her misconduct is disturbing. It is our difficult duty to withdraw a license to practice law but we shall if necessary to protect the interest of the public and the legal profession as a whole. The record is laden with inconsistent statements and unbelievable explanations. Most disturbing of which is the Respondent's difficulty in discerning the truth. Her testimony that the false statements she made to her client were somehow true at the time she made them is incredulous. A mistaken statement may be made; however, truth is not malleable. Honesty in the performance of a lawyer's professional activities is the foundation upon which his or her license stands. We hold the sum of the Respondent's misconduct warrants disbarment. Accordingly, it is ordered by this Court that the Respondent be disbarred and her name be stricken from the roll of attorneys licensed to practice law in this state.
VI. ASSESSMENT OF COSTS
Â¶41 The Complainant filed an application to assess costs on June 13, 2019. The total amount assessed was $6,669.19, the majority of which concerned the two transcripts covering 667 pages. The Complainant requests these costs be paid by a certain date. The Respondent objects to the application because: 1) the Trial Panel report did not recommend the payment of costs; and 2) she is unable to pay the costs. Rule 6.13, RGDP provides in pertinent part:
Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent). . . .
The Respondent is correct that the Trial Panel Report did not make a recommendation for the Respondent to pay the costs of the proceeding. However, the Trial Panel's recommendations are only advisory to this Court. State ex rel. Oklahoma Bar Ass'n v. Townsend, 2012 OK 44, Â¶10, 277 P.3d 1269. Rule 6.15, RGDP provides: "(a) The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate." We deem the payment of costs in this matter to be appropriate. Rule 6.16, RGDP requires a disciplined lawyer to pay the costs of the disciplinary proceeding within 90 days after the Supreme Court's order becomes effective unless the costs are remitted in whole or in part by the Court for good cause shown. The Respondent alleges in her June 20, 2019 objection that she is unable to pay the costs "at this time" and that alone is "good cause to not order her to pay same." The record established the Respondent is employed and her objection provides no evidence to support her claim. The Respondent is ordered to pay the cost of this proceeding in the amount of $6,669.19 within ninety (90) days after this opinion becomes final.
RESPONDENT DISBARRED.
COSTS CHARGED TO RESPONDENT.
Â¶42 Darby, V.C.J., Winchester, Combs, and Kane, JJ., Rowland, S.J., concur.
Â¶43 Gurich, C.J. and Kauger (by separate writing), J., concur in part; dissent in part.
Â¶44 Edmondson and Colbert, JJ., dissent.
FOOTNOTES
[1] She is currently employed as a field litigation counsel for the insurance company; Tr. Vol. 2 at 392.
[2] CJ-2011-243, District Court of Cleveland County, Oklahoma; Ex. 30.
[3] Tr. Vol. 2 at 547, 559.
[4] Id. at 549.
[5] Tr. Vol. 1 at 66-67.
[6] Tr. Vol. 2 at 308.
[7] Id. at 314; Ex. 9.
[8] Ex. 37.
[9] Tr. Vol. 2 at 320.
[10] Ex. 1.
[11] Tr. Vol. 2 at 446; Ex. 2.
[12] Tr. Vol. 2 at 446.
[13] Ex. 22.
[14] Tr. Vol. 1 at 42; Ex. 1.
[15] Tr. Vol. 2 at 554.
[16] Ex. 2.
[17] Exs. 23-25.
[18] Tr. Vol. 2 at 507; Ex. 44.
[19] Exs. 2 and 4.
[20] Tr. Vol. 1 at 33.
[21] Ex. 17.
[22] Exs. 12, 13, and 15.
[23] Id.; Ex. 16; Tr. Vol. 2, 369.
[24] Tr. Vol. 2 at 330.
[25] Tr. Vol. 1 at 73; Tr. Vol. 2 at 354-55, 448-49.
[26] Tr. Vol. 1 at 42.
[27] Tr. Vol. 2 at 355, 454.
[28] Id. at 355-56, 395; When asked why she did not put the cash into her trust account, the Respondent testified: "This--money was different, than, like, trust money. And, I mean, I was used to, ... workers' comp cases coming in, and ... I'd put the money in my trust account and then distribute out the money. . . .in my head, it wasn't something that belonged in my trust account."
[29] Id. at 355, 454.
[30] Tr. Vol. 1 at 33.
[31] Id. at 39; Ex. 1.
[32] Ex. 1.
[33] Ex. 4.
[34] Ex. 11.
[35] Tr. Vol. 2 at 521.
[36] Ex. 1.
[37] Ex. 2.
[38] Ex. 5.
[39] Ex. 6.
[40] Ex. 8.
[41] Ex. 25.
[42] Ex. 7.
[43] Ex. 9.
[44] Exs. 23-25.
[45] Tr. Vol. 1 at 104.
[46] Ex. 20.
[47] Ex. 21.
[48] At the PRT hearing the Respondent unconvincingly argues she was not implying to the Complainant that her payment of the bill had caused the lien to be released, but just that the lien was released. Tr. Vol. 2 at 375. She explains what she was trying to convey was "[h]ey maybe Therapy in Motion doesn't even have a lien. Maybe that money doesn't need to be paid. Maybe because I already paid it, I don't know." Id. She claims, "[a]t that point in time, I still think I paid Therapy in Motion." Id. 
[49] Tr. Vol. 1 at 103.
[50] Id. at 121-22.
[51] Id. at 119, 133.
[52] Id. at 132.
[53] Id.
[54] At the March 25, 2019, PRT hearing, the Respondent, however, testified that she experienced identity theft around January or February of 2015, and admitted she has no evidence of any identity theft. Tr. Vol. 2 at 527-28.
[55] Ex. 1.
[56] Respondent's Brief in Chief at 7.
[57] Ex. 76.
[58] Tr. Vol. 1 at 236.
[59] Id. at 238-39.
[60] Ex. 79.
[61] Tr. Vol. 2 at 239.
[62] Id. at 237-41.
[63] Id. at 465.
[64] Id.
[65] Id. at 479.
[66] Id. at 469, 479.
[67] Id. at 460.
[68] Id. at 523-24.
[69] Id. at 525.
[70] Id.
[71] Ex. 60, 71; Tr. Vol. 2 at 417, 430.
[72] Tr. Vol. 2 at 401.
[73] Id. at 498.
[74] Id. at 400-01, 571.
[75] Id. at 573, 575.
[76] Id. at 414.
[77] Exs. 62, 74.
[78] Exs. 63, 75.
[79] Tr. Vol. 2, 511.
[80] Id. at 499, 513.
[81] Id. at 511-13.
[82] Id. at 512.
[83] Id. at 582.
[84] Ex. 56.
[85] Tr. Vol. 1 at 141-44; 198-99.
[86] Tr. Vol. 2 at 488.
[87] Id. at 489.
[88] Id. at 488.
[89] Id. at 418.
[90] Tr. Vol. 1 at 154-55.
[91] Id. at 160.
[92] Id. at 198.
[93] Rule 1.3, ORPC, 5 O.S. 2011, ch. 1, app. 3-A:
A lawyer shall act with reasonable diligence and promptness in representing a client.
[94] Rule 1.4, ORPC, 5 O.S. 2011, ch. 1, app. 3-A:
(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules; 
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
[95] Rule 1.15, ORPC, 5 O.S. 2011, ch. 1, app. 3-A:
(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
. . . .
(h) A lawyer or law firm that holds funds of clients or third parties in connection with a representation shall create and maintain an interest-bearing demand trust account and shall deposit therein all such funds to the extent permitted by applicable banking laws . . . :
[96] Rule 8.4 (a) and (c), ORPC, 5 O.S. 2011, ch. 1, app. 3-A:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
....
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
[97] Rule 1.3, RGDP, 5 O.s. 2011, ch. 1, app. 1-A:
The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.
[98] Rule 1.1, ORPC, 5 O.S. 2011, ch. 1, app. 3-A :
A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.
[99] Tr. Vol. 2 at 433.
[100] Id. at 470.
[101] Murcia, Tr. Vol. 1 at 85; Sanders, Tr. Vol. 1 at 148; Solis, Tr. Vol. 1 at 200.
[102] Ex. 9.

KAUGER, J., with whom GURICH, C. J. and EDMONSDON, J., join, Concurring in Part and Dissenting in Part.
Â¶1 The respondent's actions warrant discipline. Her actions were clearly wrong and in violation of the Code of Professional Responsibility.
I would follow the recommendation of the PRT of an eighteen month suspension.
Â¶2 The respondent was licensed in 2003. The matters that brought the respondent into the disciplinary process began in 2012. The respondent was involved in three tort claim actions. Two of the matters involved a failure to timely file actions under the Oklahoma Governmental Tort Claims Act, (OGTCA) 51 O.S. 2011 Â§151 et seq. The second attorney testified, as noted in the majority opinion, that he believed he miscalculated the erroneous filing dates that caused the matter to be untimely filed. The petitions were prepared and signed by the respondent.
Â¶3 The third matter, the Murcia complaint, involved the representation of a client in another governmental tort claim after another attorney had failed to timely file a timely claim under OGTCA. In negotiating a settlement with this attorney, respondent received $4,600 in cash for the client, which was not placed in her client trust account, but was placed in her office safe and not accounted for. Respondent paid Murcia years later and only after the complaint was filed. Nevertheless, she did not acknowledge her responsibility for the failure to pay the complainant, and was dishonest during the investigation.
Â¶4 This court must impose discipline in a manner consistent with that imposed on other attorneys whose actions are similar to avoid disparate treatment.[1] Mitigating circumstances are also considered in assessing the appropriate discipline.[2] There are mitigating circumstances in the third and most extensive complaint, the Murcia complaint. The respondent moved her office three times, had major back surgery, was suffering from depression, and lost family members during the tenure of both the Murcia matter and during the investigation by the Bar of the complaints. She did not take a fee for her work in obtaining money from the original counsel in the matter who failed to timely file the original case. The monies received were in cash, and the respondent placed the monies in her office safe for safekeeping. There is no evidence of the conversion of funds by Miller. In the other two matters, there was another attorney involved who was involved in the legal work, with respondent involved in the administrative work of the cases. Avenues of legal redress remain for the complainants in these matters.
Â¶5 The PRT recommended an eighteen month suspension. In similar matters, attorney falsehoods have resulted in the imposition of disparate levels of discipline, including disbarment. The Court disbarred the respondent in State ex rel. Oklahoma Bar Ass'n v. Mayes, 2003 OK 23, Â¶ 1, 66 P.3d 398. Mayes had complaints filed against him alleging two counts of professional misconduct involving the mishandling and misappropriation of settlement funds belonging to minors and the failure to cooperate in the grievance process. The Court found that there was clear evidence of client fund misappropriation. The respondent was also a "multiple offender." Shortly before his disbarment proceeding, this Court had suspended him for six months. In that instance, for his failure to supervise his non-lawyer office manager. He had, because of this failure, unwittingly received, some of a client's personal injury settlement proceeds, which the office manager had converted or commingled. State ex rel. Oklahoma Bar Ass'n v. Mayes, 1999 OK 9, 977 P.2d 1073, as corrected (Feb. 23, 1999).
Â¶6 We disbarred the respondent in State ex rel. Oklahoma Bar Ass'n v. Moss, 1983 OK 104. 682 P.2d 205. There, the attorney asked a client to make a false affidavit and paid her to make an affidavit. Then, he submitted the false affidavit to the Bar Association and lied about the falsity of the affidavit.
Â¶7 Conversion of the funds of two clients for personal use, including the monies for a tax payment and untrue statements that he had made the tax payment also resulted in the attorney's disbarment in State ex rel. Oklahoma Bar Ass'n v. Raskin, 1982 OK 39, 642 P.2d 262, 264.
Â¶8 An attorney who received a second disciplinary complaint during the pendency of the first complaint, involving neglect of cases, misrepresentations to clients and misuse of client funds , submitted his resignation from the bar. State ex rel. Oklahoma Bar Ass'n v. Skof, 1989 OK 58, 772 P.2d 394. The attorney who was the subject of State ex rel. Oklahoma Bar Ass'n v. Hensley, 1983 OK 32, 661 P.2d 527, was disbarred, in part, for misrepresentations made to the court directly and in pleadings.
Â¶9 However, disbarment appears to be the exception rather than the rule in cases similar to this matter. In State ex rel. Oklahoma Bar Ass'n v. Dobbs, 2004 OK 46, 94 P.3d 31, the disciplined attorney had a history of falsehoods and concealments in responses to depositions, in the representation of facts to the Oklahoma Corporation Commission, and in matters before the Oklahoma Bar Association. He received a two year and one day suspension.
Â¶10 In State ex rel. Oklahoma Bar Ass'n v. Northrop, 1987 OK 96, Â¶Â¶ 1-2, 746 P.2d 673, the respondent made bad faith representations to a tribunal and to opposing counsel with the intent to circumvent a settlement agreement. He was suspended for two years.
Â¶11 In State ex rel. Oklahoma Bar Ass'n v. Askins, 1993 OK 78, 882 P.2d 1054, the attorney made an "affirmative misrepresentation" to the court and filed misleading documents with the court. She received a two year suspension.
Â¶12 In State ex rel. Oklahoma Bar Ass'n v. Peveto, 1980 OK 182, 620 P.2d 392, an attorney found guilty of neglecting clients' affairs and knowingly making false statements to clients and to the courts received a one year suspension from the practice of law.
Â¶13 In State ex rel. Oklahoma Bar Ass'n v. Farrant, 1994 OK 13, Â¶1, 867 P.2d 1279, the attorney converted client funds and lied to the Oklahoma Bar Association. He received a one-year suspension followed by a probationary period of one year accompanied by weekly attendance at AA meetings and monthly sessions with a professional counselor.
Â¶14 In State ex rel. Oklahoma Bar Ass'n v. Brown, 1989 OK 75, Â¶10, 773 P.2d 751, the attorney falsely endorsed a check; failed to promptly notify his client of the receipt of his funds; mislead his client concerning the distribution of the funds; and lied under oath during a deposition. He received a six month suspension.
Â¶15 In State ex rel. Oklahoma Bar Ass'n v. Johnston, 1993 OK 91, 863 P.2d 1136, an attorney who commingled and converted funds, made a false statement to the court, exhibited professional incompetence, and both failed to act promptly while representing his clients, and failed to communicate with clients received a four month suspension from the practice of law.
Â¶16 In State ex rel. Oklahoma Bar Ass'n v. Ferguson, 1960 OK 229, 356 P.2d 734, 738, the subject of the disciplinary action was an attorney who became drunk and somehow lost the money his client gave him to settle an action against the client. The attorney also failed to notify the client that the case had been set for trial and that, as a result, there was a judgment against him. He was suspended for ninety days; the Court having noted that the attorney was having marital difficulty, and mislaid the money while drunk. The then disciplinary arm of the Oklahoma Bar Association had recommended to the Court a suspension of six months.
Â¶17 In State ex rel. Oklahoma Bar Ass'n v. Layton, 2014 OK 21, Â¶Â¶ 0 - 1, 324 P.3d 1244,1245, the complainant charged the respondent with one count of professional misconduct associated with her prosecution of three men in a rape trial. The Bar Association alleged that the respondent: 1) neglected to disclose to the court and opposing counsel that her witness was going to testify inconsistently with his previous police statement; and 2) falsely denied that she had spoken to the witness before and/or during the trial. The Bar Association sought the some term of suspension and the payment of costs. The Professional Responsibility Tribunal (PRT) recommended a public censure. This court imposed no discipline.
CONCLUSION
Â¶18 The Court's responsibility in an attorney discipline proceeding is not to punish, but to inquire into and gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, the courts, and the legal profession. Discipline is imposed to maintain these goals, rather than as punishment for the lawyer's misconduct.[3] Every disciplinary proceeding presents unique issues. However, based on the history of at least somewhat comparable matters, the discipline imposed by the majority appears erratic and inconsistent.
FOOTNOTES
[1] The appropriate measure of discipline is to be guided by: (1) what is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct, and (2) what discipline avoids the vice of visiting disparate treatment on the respondent-lawyer. State ex rel. Oklahoma Bar Ass'n v. Taylor, 2000 OK 35,Â¶5, 4 P.3d 1242, , State ex rel. Oklahoma Bar Ass'n v. Schraeder, 2002 OK 51, Â¶6, 51 P.3d 570, State ex rel Okla. Bar Assoc. v. Eakin, 1995 OK 106, Â¶9, 914 P.2d 644.
[2] State ex rel. Oklahoma Bar Ass'n v. Schraeder, see note 1, supra at Â¶32, State ex rel Okla. Bar Assoc. v. Eakin, see note 1, supra.
[3] State ex rel. Oklahoma Bar Ass'n v. Layton, 2014 OK 21, 324 P.3d 1244.